ALBANY,
Jan. 1835.

The People
v.
Canal Appraisers

---

THE PEOPLE, on the relation of George Tibbits, *vs.*
THE CANAL APPRAISERS.

The proprietors of *islands*, separated by a stream in which the tide does not ebb and flow, own respectively to the centre of the stream, unless the language of the grants under which the islands are held is such as clearly and unequivocally to show, that the intent of the parties was, that the grants should not extend beyond the water's edge.

Where the stream is navigable for either boats or rafts, the *public* have a right to use it for those purposes, and the rights of the adjoining proprietors are subject to the *public easement;* but *the state* cannot divert the water of the stream, or interfere with it in any other manner which will render it less useful to the proprietors of the adjacent shores.

If, in the improvement of a *navigable river by the state* by the erection of a dam, a *water-fall* in a tributary stream *not navigable*, belonging to an individual, is overflowed and *destroyed:* such individual, within the meaning and spirit both of the *constitution* and the *canal laws*, is entitled to *compensation* for the injury sustained, equally as if his property had been *taken* for public use.

GRANTS by the legislature of *islands*, in *rivers and streams where the tide does not ebb and flow*, although made during a long series of years, will not justify that the *principle of the common law has not been adopted here*, that grants of land bounded upon rivers or streams where the tide does not ebb or flow, carry the exclusive rights of the grantees to the middle of the stream; or having been adopted, that it has ever been legally abrogated or exploded.

THE relator claimed that damages should be allowed to him by the canal appraisers for the destruction of a *water-fall* belonging to him, situate in the *middle* of the *sprout Mohawk*

*river*, nearly opposite the *junction* of the Erie and Champlain canals, by the erection of a dam across the *Hudson river*, at the sloop lock between Troy and Lansingburgh. The appraisers refused to admit the claim, and on application to this court *an alternative mandamus* was issued, to which the appraisers made a return. On the coming in of which a *peremptory mandamus* was ordered, directing the appraisers to proceed and assess his damages. The appraisers sued out a writ of error, and the *court for the correction of errors reversed* the judgment of this court, on the ground that the relator had not shown title in himself to the *locus in quo ;* but leave was given to him to *traverse* the return, so as to give him an opportunity to prove his title. *See* 5 *Wendell, p.* 423 *to* 474. Issue was accordingly taken upon the return, which was brought to trial at the Albany circuit in March, 1832, before the Hon. JAMES VANDERPOEL, one of the circuit judges.

The relator claimed to be the owner of the *middle sprout*, by virtue of a conveyance of the lands under the waters of the sprout from the proprietor of the manor of Rensselaerwyck to Jacobus Van Schoonhoven, from whom he derived title. He also claimed to be the owner of the middle sprout, *usque filum aquæ* under a conveyance of *Green island,* the northern boundary of which forms the southern bank of the middle sprout ; which conveyance was executed by a former proprietor of the manor to Peter Schuyler ; from whom, by sundry mesne conveyances, the relator deduced title. To support his first ground of claim, he read in evidence letters patent of confirmation of the manor of Rensselaer-wyck, bearing date 20th May, 1704, granted by the then colonial government to Killian Van Rensselaer, and introduced testimony to show a practical or actual location under that grant, embracing *Green Island* and the other principle islands in the Hudson lying south of that Island, and north of the south boundary of the patent ; and that the same had been held and occupied, under the manor of Rensselaer-wyck for nearly a century past. The premises containing in the *letters patent of confirmation* of the 20th May, 1704, are described as follows : " All that and those tract and tracts of land called Renssalaer-wyck, lying and being in and upon the banks of Hudson's river aforesaid

in the county of Albany, in the province of New York afore-
said, theretofore called and known by the name of ye colony
of Rensselaer-wyck. Beginning at the south end or part of
Berrien island, on Hudson's river aforesaid, and extending
northward up along both sides of ye said river, unto a place
theretofore and yet called called the *Kahoos*, or *Great Falls*
of ye said river, and extending itself east and west all along
from each side of the said river, backwards into the woods
twenty-four English miles. With all and singular the rights,
members and appurtenances, &c. and with all and every the
isles, islands, rivers, creeks, runs of water, mines, minerals,
(royal excepted) fishings, &c. and all other royalties, &c. to
the said premises, or any part thereof belonging or appertain-
ing." In support of his second ground claim, the relator
produced a deed from Killian Van Rensselaer (the grantee in
the patent of confirmation) to Peter Schuyler, dated 10th May,
1708, conveying *Green Island*, and deduced title from the
grantee in that deed to himself of the *northerly half* of that
island. The relator also proved that Joseph D. Selden was
a lessee of a mill site *on the west sprout of the Mohawk riv-
er*, under title derived from the proprietor of the manor of
Rensselaer-wyck, and that his mill site being destroyed by
the construction of the Champlain canal, the legislature, by
a special act passed 18th March, 1828, provided for the ap-
pointment of commissioners to assess his damages, and that
such damages were subsequently assessed at $6376, and *paid
by the state*. The relator further proved that the sprouts of
the Mohawk are *not navigable* in ordinary seasons; that in
the middle sprout there is a *fall* which, previous to the erec-
tion of the dam in the Hudson between Troy and Lansing-
burgh, was about 12 feet 10 inches high, but is now covered
by means of back water, in consequence of the dam so erec-
ted, to within 2 feet 10 inches.

The *defendants* read in evidence *letters patent*, bearing
date 13th October, 1665, granting to Philip Peterse Schuy-
ler and another an *island* (now known as *Van Schaick's isl-
and*) which lies directly north of the middle sprout of the
*Mohawk River*, its southern boundary forming the northern
bank of the sprout; which island is described in the letters
patent as follows " A certain island called by the Mahikanu

indians *Quahemesicos,* and commonly known by the name of long island, situate, lying and being between the second and third spring *beyond and above the colony of Rensselaer-wyck,* near Albany." They also produced letters patent of the same date to the same patentees of a tract of land called the *Half-moon,* described as lying to the north of the fourth spring *beyond and above the colony of Rensselaer-wyck :* which was confirmed by a *patent of confirmation,* bearing date 4th May, 1668, and in the same an additional grant was made of three small islands lying in the north river, " over against said tract or parcel of land called the Half-moon." The whole of which tracts were subsequently confirmed to Anthony Van Schaick, by patent or confirmation bearing date 30th May, 1687. The defendants also proved that a line run east from the *Kahoos falls,* as a designation of the northern boundary of the manor of Rensselaer-wyck, would include within the manor Van Schaick's island and a part of the patent of Half-moon ; that previous to the erection of the state dam on the Hudson, the tide ebbed and flowed 150 rods above the mouth of the sprout, and affected the sprout 6 or 8 inches *up to the falls in question ;* and it was admitted that there never had been a dam or other works erected on the middle sprout. The defendants contended that the principle of the common law, that the owners of the banks of streams and waters, where the tide does not ebb and flow, hold *adfilum aquæ,* has *never been adopted in this state ;* but that on the contrary the government, as well *before* as *since* the revolution, have claim-ed and exercised the right of granting islands in rivers and streams where the tide does not ebb and flow, although the lands on the banks of those rivers and streams had been *pre-viously* granted ; and in support of this ground of defence, the defendants produced in evidence the following numerous letters patent and acts of the legislature, from the year 1668 down to the present day, viz. : Letters patent dated the eighth day of May, 1688, whereby the colonial government granted to Hilitye Cornelys, Great island in the Mohawk river, situate north of Albany—a patent of the colonial gov-ernment, dated the ninth day of August, 1694, granting to Simon S. Groot an island in the Mohawk river, situated north of a point of Ryer Jacobson's land, and to the southward of

the island belonging to Jans Aersen. A patent of the colonial government, dated the 29th day of October, 1770, granting to William Fisher five islands in the Batten Kill river, in the following words: "All those five islands lying near each other in the Batten Kill river, in the county of Albany, which said islands are situate between lands granted to Alexander Turner and others, and lands granted to Ryer Schermerhorn and others, near the house of James Moore, containing twenty-five acres." It was proved, on the part of the defendants, by the proper patents, laws, grants, and documents, and by the testimony of Simeon De Witt, the surveyor general, who had examined the public records for the purpose, that the patent to Ryer Schemerhorn was granted in 1762, and to Alexander Turner, in 1764; Turner's patent being on the north side and Schermerhorn's on the south side of the creek, both bounded by it. They also proved that the patents issued for lots in the military tract to soldiers of the revolutionary army, contain no description except the numbers of the lots; but that the survey and field notes in the surveyor general's office do contain a description of the boundaries of the lots ; where such lots are situated on navigable rivers, they are bounded on the bank of such rivers or streams, and run thence along the bank of such streams or rivers to the place of beginning, or to some specified place. That after such survey and allotments, and the issuing of the patents, the state granted the islands opposite the said lots to other and distinct purchasers and grantees. That in the Seneca river, Flagg island, Middle island, lying opposite to No. 45, in the town of Brutus ; Hickory and Meadow island and Depuy's island, lying opposite to lot No. 86, and very near said lot were so granted. That the state caused to be surveyed and sold the island called Fort Brewerton, in the Onondaga river, lying opposite to lot No. 10, in Cicero. That by an act of the legislature, passed in the year 1808, the state granted to Ezra L'Hommedieu Magee's island, situate in the same river, lying opposite to the lands held by him under a prior patent. That the state has conveyed and granted the following islands in the Oswego river : Broadstreet and Millstreet islands, Van Volkenburgh's Great island, lying opposite to lot

No. 56, in Hannibal, also Little island, Lower Landing isl-
and, Upper Landing island, Waterhouse island, Newkirk's
island, lying opposite his patent and near the lower end; al-
so Oxcreek island in Oswego river, opposite to lot No. 19, in
Lysander, the River Riff island, opposite to lot No 42, in the
same town, after the lands on the main shore, opposite to
which they are situated had been granted.   That by separate
patents, ten of which bear date the 13th September, 1791,
and ten the 2d May, 1792, the state granted to Ezekiel
Crocker twenty islands, situate in the Tiaughnioga branch
of the Chenango river, in the county of Tioga, the first lying
430 chains below the first branch of the said river, and the
other between that island and the said branch, which islands
are opposite the Massachusetts ten townships.   That by an
act of the legislature, passed the 10th day of March, 1803, for
the consideration of $50, the state granted to Solomon Smith
all the right and title of the people of the state to an island
situate in the Hudson river, in the town of Greenwich, in the
county of Washington, lying opposite to the mouth of Stone
Kill, at the north-west corner of Campbell's patent, being one
chain and twenty-five links from the east bank of the river,
containing, by estimation, 23 acres of land.   That islands
in the Chenango river and a branch of it had since the
revolution been granted by the state, long after the lands
on each side of the river had been granted.   That in the year
1794, the state, by letters patent, granted to Charles Anderson
an island situated in the Chenango river, opposite to lots Nos.
96 and 97, in the township of Fayette, in the town of Oxford,
after the last mentioned lots had been granted.   That in pur-
suance of an act of the legislature, passed the 24th day of
March, in the year 1809, letters patent issued to Nathaniel Lock
for a small island in the Chenango river, opposite to lot No.
91, in the town of Oxford ; that the land on both sides of the
river opposite the said island had been previously granted.
That on the 6th October, in the year 1741, a patent was grant-
ed to Peter Winne for four tracts of land, the first of which is
on the north side of Upper or West Canada Creek, about one
and a half miles from its mouth ; and also all the small isl-
ands in the Mohawk river, from the upper end of the great

falls there in the said river, below Burnet's field, to the place where the Canada kill falls into the said river, and thence in the Canada kill, from the mouth thereof to the place where the first tract began ; that patents to the German settlers individually and separately for lands on both sides of the Mohawk river, from the Little Falls to the mouth of the Canada creek, and opposite the said islands granted to Peter Winne, and thence up along the said Canada creek to Winne's first tract, and opposite the island patented to him, were granted the 30th April, 1725. A map of Burnet's field, indicating the lands and islands granted to Peter Winne, and by the patents of 1825 from the surveyor general's office, was produced and exhibited by the surveyor general ; that the lands along the shore of the Niagara river were sold previously to the islands ; that Grand Island, and several small islands in the Niagara river, were sold by the state, after the lands opposite to them had been sold by the state ; that the commissioners of the land office made a contract with Alexander Macomb for a tract extended along Lake Ontario and the St. Lawrence river, together with all the islands in the lake and the river opposite the main land, excepting the Isle Long Saut and Carleton's Island, which two islands have since in part been sold by the state, and all the other islands have been granted to the assignees of Macomb. The defendants' counsel also produced and read in evidence a patent to Henry Stilson, dated the 15th of April, 1771, for land described as follows : All the tract of land and ground under and covered with the water of Hudson river, in the county of Albany, within our province of New York, beginning on the west bank of the said river at the division line between lot No. 7 and lot No. 8 in the 19th allotment of the partition of Kayaderosseras patent, and runs thence into the said river east three chains ; thence parallel to the said bank of the said river, at three chains distance, south thirteen degrees east one chain and sixty links, and south thirty degrees east five chains and sixty links ; then west three chains and forty-five links, to the bank of the river ; and then along the said bank, as the same

ALBANY,
Jan. 1835.

The People
v.
Canal Appraisers.

doth wind and turn northward, to the place of beginning; containing two acres. That a few years ago, the breaking of the dam, which crosses the river near the city of Troy, created an island in the river, which has been claimed by the state, and leased by the commissioners of the land office. The defendants also produced and read in evidence an act passed the 17th of April, 1826, entitled " An act confirming to David A. Ogden certain lands situate in a branch of the river St. Lawrence ;" an act passed the 24th of April, 1823, entitled " An act to authorize the erection of a dam across the Mohawk river at Utica, in the county of Oneida ;" an act entitled "An act for the relief of John M'Donald, Archibald M'Intyre and Robert M'Queen," passed the 15th April, 1817; an act entitled "An act for the relief of the legal representatives of John M'Donald, deceased, and Archibald M,Intyre," passed 17th April, 1822 ; an act entitled " An act authorizing Alexander Alexander to erect a dam across the Mohawk river, and for other purposes," pasted 2d April, 1805 ; an act passed April 5th, 1803, granting unto Warren Ferris all that certain island, situate in the Hudson river at the fall called Glen's Falls ; and an act of the legislature passed the      day of      authorizing the construction of a wing dam on the east side of the Hudson, at Fort Miller falls, for hydraulic purposes. The jury found a verdict for the relator.

On the coming in of the *postea*, the counsel for the relator moved for judgment that a *peremptory mandamus* issue, directing the defendants to· proceed and assess the damages of the relator. The question was debated at great length by

*J. T. B. Van Vechten & A. Van Vechten*, for the relator, and by

*Harmanus Bleecker & Greene C. Bronson*, (attorney general,) for the defendants.

The arguments of counsel were much the same as when this case was before *court for the correction of errors, see* 5

ALBANY,
Jan. 1835.

The People
v.,
Canal Ap-
praisdrs.

*Wendell, pages* 428 *to* 443, to which the reader is referred, as containing a very imperfect sketch of able and learned arguments on a most interesting question.    The reporter, however, conceives it his duty to add, that the *attorney general,* in the course of his argument in support of the position for which he and his associate contended, that the principle of the common law, assigning to the owners of the banks of *of rivers, not navigable,* the beds of the rivers *ad filum aquæ,* had *not been adopted in this state;* or, that the state had claimed and exercised the *prerogative right* of reforming obstructions or annoyances existing to the free navigation of rivers, whether *navigable or not*—in addition to the instances cited on the former argument, and to those adduced in evidence on the trial of the issue, referred the court to the act of the legislature amending the "*act for establishing and opening lock navigation within this state,*" passed 22d December, 1792.    By the *fifth* section of which act, it is declared " that *all the land un-er the water in the Mohawk river,* which may be occupied by the corporation first above mentioned, (viz. the president, directors and company of the western inland lock navigation in the state of New York,) for the purpose of constructing any canal, lock, dyke, embankment or dam, for the improvement of the navigation thereof, shall be, and hereby is *vested in the said corporation* and its successors, &c. for and during the existence of the said corporation, and no longer, and for the purposes aforesaid, as a *free gift from the people of this state;* saving and *reserving to* the people of this state the right to all lands under the water, not so occupied as a foresaid, *to be appropriated as the legislature shall from time to time direct;* and that *all lands under the water in Hudson's river,* which may in like manner be occupied by the said corporation last mentioned, &c. shall in like manner be *vested in the said corporation,* and for the like purposes, and under the like saving and reservation, as a *free gift from the people of this state.*"
This act, the *attorney general* argued, was conclusive evidence of the assertion of title on the part of the state to the beds of *rivers not navigable :* the grant in the act in relation to the

ALBANY,
Jan. 1835.

The People
v.
Canal Ap-
praisers.

lands under water in the *Hudson river*, having reference by the terms of the act to the Hudson above tide water.*

The reporter conceives it his duty also to add an argument, relied on by the counsel for the relator, not distinctly put forth, though referred to in the report of the argument in 5 *Wendell*, 441, viz. that allowing all rivers, fresh as well as salt, to be under two *servitudes*, or affected by them, as stated by *Hale* in his treatise *de jure maris*, viz. one of *prerogative*, belonging to the sovereign power of the state, and another of *public interest*, belonging to the people in general : still, it cannot be denied that it was competent to the *sovereign power* to divest itself of such *prerogative right* by grant to an individual. And such grant, it was contended, was made in this case by the patent of confirmation of 1704. By it, not only the tract of land described in the patent was granted, but also " all and every the *isles, islands, rivers, creeks, runs of water, mines, minerals (royals excepted) and all other royalties, franchises*, &c. and hereditaments whatsoever to the said premises belonging or appertaining ;" and it was urged that the single exception of *royal mines* and minerals clearly denoted that all other royalties, franchises and prerogative rights are and were intended to be included in the grant.

---

* Since the argument of the case, the *attorney general* has kindly directed the attention of the reporter to the fact, that this act of the legislature was returned to the house of assembly by the then *council of reversion* with objections both to its *constitutionality* and *expediency*, and that it was notwithstanding passed by more than two-thirds of the members present. By the *third section* of the act, the lock navigation companies were authorized to enter upon any lands, &c. without the permission of the owner, and previous to appraisement of damages, and to dig, trench and use the land for the purposes of the incorporation of the companies. The following were the objections of the council of revision : " The council object against the bill entitled *An act*, &c. becoming a law of this state, as inconsistent with the spirit of the constitution and the public good. *First*, because the power intended to be vested in the presidents and directors may in its execution prove subversive of the rights of private property, by divesting the proprietor of his land in cases not indispensably necessary for the attainment of an object of public utility : the third enacting clause of the bill not only providing ' for the appropriation by the presidents and directors of the land on which any canal, lock, dyke, embankment, pond, dam or other work shall be constructed, but extending such appropriation 100 feet on both sides of any such erections or works, and expressly declaring that the land so acquir-

*By the Court*, SUTHERLAND, J. The first question to be considered is, whether the relator has shown a title to the middle sprout of the Mohawk river, and that involves the inquiry whether the middle sprout is embraced within the manor of Rensselaer-wyck. The relator has exhibited a regular paper title under that patent to the middle sprout *eo nomine.* The description of that patent, as contained in what are called the letters patent of confirmation, dated the 20th May,1704, from the then colonial governor to Killian Van Rensselaer, as follows: "All that and those tract and tracts of land called Rensselaer-wyck, *lying and being in and upon the banks of Hudson's river* aforesaid, in the county of Albany,in the province of New York aforesaid, theretofore called and known by the name of the colony of Rensselaer-wyck, beginning at the south end or part of Berrien Island *on* Hudson river afore-

ALBANY,
Jan. 1835.

The People
v.
Canal Apprai-
sers.

---

ed may be applied to such uses as the presidents and directors shall think proper : thus wresting from an individual his property in a manner only justifiable in cases of urgent public necessity, without imposing on the company, to which his right is devolved, as a duty, that it shall be sacredly applied only to the advancement of those interests of the company in which its private emolument is inseparably connected with the effectual promotion of the public good. *Secondly*, because, previous to executing or even obtaining a writ of *ad quod damnum*, the bill authorizes the presidents and directors, or their agents, to enter upon, *dig*, trench and use the land of any citizen, without his permission ; thus sanctioning a destruction of timber and improvements, before proper precautions have been taken to ascertain the amount of the injury sustained ; and in many instances depriving the party affected by such proceedings of the most conclusive proof of the extent of that injury, arising from a relative comparison of the several parts of the land on which works are constructed, and those adjoining them, and a collective view of the state of the improvements rendered useless by the appropriations made by the presidents and directors.'" *Assembly Journal*, 1792, *p.* 79. It will not fail to be observed, that though the attention of the *council of revision* was particularly directed to the *third section* of the act, no objection whatever was made to the *fifth section*, although containing principles infinitely more important to the rights of the citizens than those embraced in the third section, if the common law doctrine that the *beds of rivers above tide water belong to the owners of the adjacent banks*, had been considered by the council of revision as adopted in this state. The bill was passed in the *assembly*, notwithstanding the objections of the council of revision, by a vote of 51 to 9, *Assembly Journal of* 1792, *p.* 79 ; and in the *senate*, with the concurrence of *all the members* present except one. *Senate Journal of* 1792, *p.* 36.

said, and extending northward up along both sides of the said river, unto a place theretofore and yet called the Kahoos or Great Falls of the said river, and extending itself east and west, all along from each side of said river, backwards into the woods twenty-four English miles; with all and singular the rights, members and appurtenances of said tract, &c. together with all *and every the isles, islands, rivers,* creeks, runs of water, mines, minerals, &c. to the said premises or any part thereof belonging or appertaining."

When this cause was formerly before the court of errors, 5 *Wendell,* 423, various opinions were expressed by several members of that court as to the location of this patent. There was then no evidence in the case as to the location actually made, or as to any claim or acts of ownership under it by the patentee or his heirs or grantees. The question of location arose and was considered with reference to the terms of the patent alone.

The chancellor held that the patent included all the lands or islands *in* the Hudson river, as well as the 24 miles in width on each bank thereof, by force of the terms, *"lying and being in and upon the banks of Hudson's river,"* and that both sides of the river were referred to, (*extending up along both sides of said river, &c.*) as forming a base from which the 24 miles were to be reckoned each way; but that the previous expressions showed that the colony of Rensselaer-wyck included the islands or lands lying and being *in* the river, as well as the lands on the banks thereof on each side. He remarked, *page* 451, that the lands lying under the waters of the river were not granted as such *in express terms;* and therefore, by the rules of the common law, that part which was actually covered by the *tide waters* did not pass by the grant; but that he was satisfied that all the islands, and the bed of the river *above tide water,* were actually covered by the patent to Van Rensselaer; and that therefore the legal title to the middle sprout of the Mohawk, which is a mile or two below the north bounds of the patent, *if it had not been previously conveyed,* passed to Van Schoonhoven by the deed of 1792, and from him to the relator.

Mr. Senator Allen also thought the terms of the patent broad enough to cover the islands in the river; but, indepen-

dently of that question, he was of opinion that it would cover the middle sprout, upon any principle of location which could be applied to it. If the patent was to extend north on both sides of the *Hudson*, until it would strike an east and west line drawn from the Cahoes falls to the Hudson, then he observed that the rolling out or extension of the patent to the *west* would cover the middle sprout. If, however, the patent be extended north on both sides of the *Hudson* only, until it reaches the southerly end of Green Island, where the south branch of the Mohawk empties into the Hudson, and then, for the purpose of reaching the Cahoes, the northern termination of the patent, leaves the *Hudson* and runs up both sides of the south branch of the Mohawk to the falls, and then rolls out east and west, the extension to the east would cross the Hudson and cover the middle sprout.

Senators Beardsley and Benton, on the other hand, held that neither the bed of the river nor the islands in it were embraced within the terms of the patent, and seemed to think that the patent must be located by running up on both sides of the Hudson, to the mouth of the south or west branch of the Mohawk, and then by following that branch to the Cahoes with one line, and keeping on the east side of the the Hudson with the other, to a point on the Hudson, where an east line from the Cahoes would intersect it; that rolling these lines back east and west, the tongue of land between them would not be included, nor of course the middle sprout; and as the east line, upon the principle of *usque ad filum aquæ*, would extend only to the middle of the Hudson, and the west line only to the centre of the west branch of the Mohawk, the patent on this ground could not cover the islands nor the middle sprout; and they accordingly came to the conclusion that the relator had failed to establish title to the premises, for an injury to which he claimed damages. The majority of the court concurred in that view of the case, and the judgment of the supreme court was reversed upon that ground, with leave to the relator to traverse the return, and establish his title upon a new trial if in his power.

When this cause was originally before the supreme court, it was not denied that the middle sprout was within the boun-

daries of the patent of Rensselaer-wyck. It was impliedly at least conceded that it was so. But the appraisers put their refusal to allow the relator any damages solely upon the ground that the middle sprout, or the land under it, did not, upon principles of law, pass to Van Rensselaer, the patentee, although embraced within the external limits of the grant, but that it still belonged to the state. No question was made before us as to the construction or location of that patent. 6 *Cowen* 551, *note.* We have now, however, considerable evidence tending to show the actual practical location of the patent. The middle sprout, it will be recollected, lies between Van Schaick Island on the north and Green Island on the south, extending from the west sprout of the Mohawk to the Hudson, between those two islands. It appears from the testimony given upon the trial, that Van Schaick Island was granted by letters patent on the 13th October, 1665, to Philip Peterse Schuyler and Gosen Garretse, nearly 40 years before the confirmation of the patent of Rensselaer-wyck. It is described as situate, lying and being between the second and third spring, beyond and above the colony of Rensselaerwyck, near Albany; together with all woods, *waters, lakes, creeks, rivers, &c. to the said island belonging,* with their and every of their appurtenances, &c. Green Island was granted by Killian Van Rensselaer, the patentee, to Philip Schuyler in fee, on the 10th May, 1708, four years after the confirmation of the patent. The terms of this grant are not given in the case; but a regular deduction of title under it is shown down to March 1st, 1796, when the north half of the island was conveyed to the relator by Henry Oothout, the then proprietor. It is shown that neither the west nor the middle sprout of the Mohawk are navigable for any purposes in ordinary seasons, and that the fall in the middle sprout, before the erection of the state dam, was about 12 feet 10 inches, and that the tide never ebbed and flowed above the fall, nor in either of the other sprouts.

It was also shown and admitted that all the lands along the west sprout of the Mohawk, up to the Cahoes falls, were held under ancient leases in fee from the proprietor of the

ALBANY,
Jan. 1835.

The People
v.
Canal Appraisers.

manor of Rensselaer; and that there was a considerable manufacturing establishment on the western sprout, known by the name of the Cahoes Manufacturing Company, who also derived their title to the land occupied by them, and the water of the river which was used in carrying on their work, from the proprietor of the manor. A lease was also produced and proved from Stephen Van Ransselaer to Charles Haemstratt, bearing date September, 1794, granting him liberty to erect a grist-mill on the western sprout, and a supply of water therefore for the term of twenty-one years. Abraham Van Vechten testified that the islands in the Hudson river, opposite to the farm of Thomas Hillhouse at the flats, and the large island below the city of Albany, called Martin Garretse's island, were then, and had been as long as he could remember, held under the manor of Ranselaerwyck. A map of the manor of Rensselaer was also produced, in which was included and laid down as within the manor, the west and middle sprouts of the Mohawk and Green Island, and on which the fall claimed by the relator was located, in the middle sprout. It was shown, on the part of the defendants, that the patent of Halfmon was granted on the same day with the patent of Van Schaick's Island, and to the same patentees, and that both were confirmed to Anthony Van Schaick on the 30th May, 1687. It was admitted, on the part of the relator, that the proprietor of the manor of Rensselaer had never claimed or had possession of any of the lands embraced in said patent; and it was proved, on the part of the defendants, that all the islands in the north sprout, north of Van Schaick's Island are held under Van Schaick's patent. For the purpose of showing a recognition on the part of the state, of the title of the proprietor of the manor of Rensselaer, to the western sprout of the Mohawk, the relator gave in evidence an act of the legislature of this state, passed the 18th of March, 1828, authorizing the supreme court to appoint three appraisers to assess the damages which Joseph D. Selden might have sustained by means of the construction of the Champlain canal. His damages consisted in the destruction of a mill-sit and water privileges upon the west sprout

held under the manor title. His damages were shown to have been assessed at $6376, and to have been paid by the state.

This is the substance of the evidence in relation to the title of the relator to the middle sprout. It shows satisfactorily that Green Island and the other principal islands in the Hudson river were embraced within the original practical location of the manor of Rensselaer-wyck, and have been held under that title for more than a century. Whether that location was justified by the terms of the patent, it is at this day, and particularly in relation to this case, of very little importance to consider. It is sufficient to say that that construction of the patent is at least as plausible, with reference to its terms merely, as that contended for by the defendants, and which would exclude from the patent the islands in the Hudson. Green Island, then, must be considered, for the purposes of this case, as belonging to the manor of Rensselaer-wyck, and as having passed, with all its common law appurtenances, to Peter Schuyler, under the conveyance from Killian Van Rensselaer of the 10th of May, 1708; and the north half of the island, bounded upon the middle sprout, is shown to have vested in the relator and his brother as early as March, 1796, through a regular deduction of tittle from Schuyler through the family of Oothouts.

The facts, then, upon which the relator's title to the middle sprout depends are these : The middle sprout is a branch of the Mohawk river, in which, above the falls, the tide never ebbs or flows, and which never has been used, and is incapable of being used for any species of navigation. The relator owns the north half of Green Island, which is bounded on the north by the middle sprout. Van Schaick Island lies upon the opposite side of this stream, and is bounded by it on the south. The relator neither claims nor shows any title to this island ; it is held under a patent older than the patent of the manor of Rensselaer-wyck. Upon the acknowledged principles of the common law, the proprietors of these islands own respectively to the centre of the stream; for nothing is better settled than that grants of land, bounded upon rivers or streams where the tide does not ebb or flow, carry the exclusive right of the grantees to the middle of the stream, unless

the language of the grant is such as clearly and unequivocally to show the intent of the parties that it should not extend beyond the water's edge. Where the stream is navigable for either boats or rafts, the public have a right to use it for those purposes, and the rights of the adjoining proprietors are subject to the public easement. They can use the water, or the land under the water, in any manner which does not impair its use as a public highway ; but they cannot erect dams, or place other obstructions in the stream, which will interfere with its free and convenient use for public purposes. Nor can the state divert the water of the stream, or interfere with it in any other manner which will render it less useful to the proprietors of the adjacent shores. This doctrine is perfectly settled in England, and has been repeatedly acknowledged and applied in this court and in the court of several of our sister states. The English and American authorities are all referred to in the learned and elaborate note of the reporter, in *Ex parte Jennings*, 6 *Cowen*, 548, *et seq.*, and in 3 *Kent's Comm.* 427, 428, 429, 430, 2d ed. *Hale's de Jure Maris*, ch. 4, 5. *Dougl.* 425. *Palmer* v. *Mulligan*, 3 *Caines' R.* 318. *Shaw* v. *Crawford*, 10 *Johns. R.* 236. *The people* v. *Platt*, 17 *id.* 195. *Hooker* v. *Cummings*, 20 *id.* 90. *Ex parte Jennings*, 6 *Cowen*, 518. This principle has been recognized and adopted not only in this state, but also in Maine, New-Hampshire, Massachusetts, Connecticut, New-Jersey, Maryland, Ohio and Virginia. 3 *Greenl. R.* 269, 474. 2 *N. Hamp. R.* 369. 7 *Mass. R.* 496. 14 *id.* 149. 4 *Pick. R.* 268. 2 *Conn. R.* 481. 6 *id.* 471. 1 *Halst.* 1. 1 *Rand.* 417. 3 *id.* 33. 3 *Ohio R.* 495. 5 *Harr. & John. R.* 195. It is not my intention to enter into a discussion of the question whether this principle of the common law is suited to the nature and extent of our inland streams. That is no longer an open question in this court, in relation to streams of the character and description of the middle sprout. The principle has been applied in the various cases above referred to, and its wisdom and applicability to our condition are there satisfactorily maintained.

Cases may arise in which the application of this principle will be found to interfere with either general or special acts of the legislature. A number of instances were referred to up-

ALBANY,
Jan. 1835.

The People
v.
Canal Appraisers.

on the argument, and are mentioned in the testimony of the surveyor general, given upon the trial, in which the islands in the Hudson and Mohawk, and various other streams where the tide does not ebb and flow, have been specifically granted by the legislature, separate and distinct from the land on their respective banks. It was contended that these grants afforded satisfactory evidence that the principle of the common law which we are now considering had never been adopted in this state. With respect to most of those cases, it may be said, that the terms of the grants, both of the islands and the main land, and their respective dates, and the circumstances and representations under which they were obtained, are not sufficiently disclosed to enable us to form any definite opinion as to their legal effect and bearing. The riparian owners may have limited themselves by practical location to the margin of the stream, when the terms of their patent would have carried them *usque ad medium filam aquæ*, or the terms themselves may have been such as to exclude the stream. In some of the instances specified in the case, however, it must be conceded that the legislature appear to have overlooked or disregarded this principle of the common law. But the evidence is insufficient, in my judgment, to justify the conclusion that the principle never was adopted in the colony or state, or having been adopted, that it was ever legally abrogated or exploded. If controversies shall arise under these conflicting grants, they must be disposed of according to the circumstances of each particular case.

If the relator is the owner of one half of the bed of the middle sprout and of the fall, and his beneficial enjoyment of it has been impaired or destroyed by the erection of the state dam, his title to damages appears to me to be as perfect, both upon general principles and under the special acts applicable to these cases, as though the injury had consisted in the overflowing or destruction of Green Island itself. When private property of any description is destroyed, and its beneficial enjoyment is essentially impaired in the prosecution of the public works, it is taken for public use, within the meaning and spirit both of the constitution and the canal laws, and the owner is entitled to just compensation. The state has no more right, by

an artificial erection like the state dam, to overflow and destroy a valuable water fall in a tributary stream, without paying for it, than it has to overflow and destroy a valuable farm upon the adjacent shore. In principle, they stand upon the same ground. The case *Ex parte Jennings* is decisive upon this point.

I have considered the title of the relator to the middle sprout as derived solely from his deed for the north half of Green Island, which carried him to the middle of the stream; and I have not supposed his title at all strengthened or enlarged by the conveyances from Van Schoonhoven to him for the whole of the stream and the land under it. Van Schoonhoven derived his title under a quit claim deed from the present proprietor of the manor, dated the 5th of May, 1792; and in September, 1795, he conveyed the middle sprout to the relator. There is no evidence in the case of any actual appropriation of the stream, or any portion of it, or any other act of ownership over it, by the relator or any other person. His rights, therefore, depend entirely upon the legal effect of the paper title exhibited in the case; and it has already been shown that the proprietor of the manor of Rensselaer-wyck acquired under his patent a title to but one half of the middle sprout, which passed to Peter Schuyler, under the conveyance of Green Island of the 10th May, 1708, from Killian Van Rensselaer. The north half of the sprout had previously vested in the Van Schaicks, under the patent for Van Schaick Island, and for aught that appears in the case, is still appurtenant to that estate. Van Schoonhoven then acquired no interest in the middle sprout, under his deed from the patroon of May, 1792, and of course conveyed none to the relator in September, 1795.

The relator's title, therefore, extends only to the south half of the middle sprout and the fall, and to that extent he is entitled to have his damages assessed.

Judgment accordingly.