THOMAS MIDDLETON, appellant, v. CHARLES PRITCHARD et al.,
appellees.

*Appeal from Madison.*

A grant is to be taken most strongly against the grantor.

Where the Government makes a grant, and does not reserve any right or interest that could pass by the grant, and does no act showing an intention to make such reservation, the grant must be intended to include all that might pass by it.

At common law, the title of a riparian proprietor of land, bounded by a navigable stream, extends only to high water mark  If the land is bounded by a stream not navigable, the rights of the riparian owner extends to the middle thread of the current.  In this case, the water, and the soil under it, to the centre of the current, are exclusively in the riparian owner.

At common law, only arms of the sea, and streams where the tide ebbs and flows, are deemed navigable.  Streams above tide water, although navigable, in fact, at all times, or in freshets, are not deemed navigable in law.

All grants bounded upon a river not navigable, by the common law, entitle the grantee to all islands lying between the main land and the centre thread of the current; and grants by the Government are to be construed according to the common law, unless the Government has done some act to qualify or exclude that construction.

The Mississippi river is not a navigable stream at common law, and the title of a riparian proprietor, whose lands are bounded by it, extends to the middle thread of the stream, and includes islands which are separated from the main land by sloughs; but it seems that navigators are not limited to the bare privilege of floating upon the water, but they have the right to land and fasten their boats or vessels to the shore, as the exigencies of navigation may require; and this is a burthen upon the owner of the lands, which he must bear as part of the public easement.

THIS was an action of *trespass quare clausum fregit*, instituted in the Madison Circuit Court, by Middleton against Pritchard and Hafford, for the recovery of damages which the plaintiff had sustained by the cutting of trees on land which he claimed to be in his possession.  The cause was heard before the Hon. Sidney Breese and a jury, at the September term, 1841, when the following bills of exceptions were taken, which show the facts in the case:

" Be it remembered, that on the trial of the above entitled case, the plaintiff showed title in one Robert Smith, to the east half of fractional section No. thirteeen, in township five north, range ten west of the third principal meridian, and a lease from said Robert Smith, of the land described in the declaration in this case, to the plaintiff, with leave to cut and carry away timber, wood, &c.

" The cutting of trees by defendants, without license, upon the land so leased, at and before the time specified in said declaration, was admitted.

" The land leased, upon which is the *locus in quo*, is a small island or peninsula, extending from the east half of fractional section thirteen, into the river, and would be embraced within the lines of the said half section, if the same were extended to the centre of the river, as appears from the survey returned to the office of the register of the land office in Edwardsville, which was exhibited, together with the certificate of the Surveyor General of the proper district, and copies of which are hereunto annexed.  From the

main land, said island or peninsula is separated by a small slough, through which the water flows at a high stage of the river, but during a common low stage of the river, the slough is dry, or occupied through a part of its length with standing water. The timber on the island aproaches the timber on the main land, at an average of from two to three rods. The intermediate space is occupied by drift-wood, and during a part of its course, especially at the upper end, by grass. About the middle of the slough, sets in a drain from some neighboring marshes, at the mouth of which, in the slough, is usually, except in dry weather, a pool of standing water. The immediate channel of the slough, not occupied by timber, has no abrupt banks; but the land gradually descends from the higher parts of the island and main land. At a very high stage of the river, the whole island and neighboring bottom or main land is overflowed. There is a ridge or high bank or bench on the main land, which is distant from the immediate channel, through which the water passes at a high stage of the river, some twenty or twenty-five feet. This bank is covered with sward, and heavy timber grows over it, and between it and that part of the slough which is bare of timber. The water flows through the slough on an average of from two to three months in the year.

"The bearing tree which limits the eastern line of section thirteen, is below the said island or peninsula, on the immediate high bank of the river; and is reached by the river when the river is at full banks. The other lines of section thirteen, have no bearing trees or tangible limits, so far as appeared on the river; if any such there were, they seem to have been washed away. The situation or condition of the slough has not changed materially within the last thirty years.

"This was the substance of the evidence; and thereupon (the evidence on both sides being concluded,) the plaintiff, by counsel, requested the Court to instruct the jury as follows:

'Middleton *v.* Pritchard and Hafford.

'The plaintiff, by his counsel, requests the Court to instruct the jury;

'*First.* That the owner of land bounding upon a river, declared a public highway, owns to low water mark.

'*Second.* When land is granted, bounded by lines that terminate on a river declared a public highway, the grant is presumed to extend to low water mark.

'*Third.* That a small peninsula or island, separate from the main land on the Mississippi, by a channel or slough, filled with grass and drift-wood, and through which the water passes only at a high stage of the river, is the property of the riparian owner, especially if the fraction owned by the riparian owner would, if extended so as to constitute a full division, according to the ordinary content of the government survey, include the said island or peninsula.

'*Fourth.* That the survey of fractional section thirteen, the land in question, extends to the middle of the Mississippi river.

'*Fifth.* That the riparian owner of land, on a river, is entitled to alluvium and accretions, by which his land is extended towards the middle channel of the river.

'STRONG and HALL, Atty's.'

Which instructions the Court severally refused; to which refusal, the said plaintiff, by his counsel, then and there excepted, and prayed that this, his bill of exceptions, might be sealed, which is done.

And, thereupon, the said defendants, by their counsel, requested the Court to instruct the jury as follows, viz:

'Middleton *v.* Pritchard and Hafford.

'The Court is asked to instruct the jury that the land of riparian owners on the Mississippi river, in the State of Illinois, extends only to ordinary high water mark, unless expressly extended beyond it by the terms of the grant, or by the government surveys.

'WM. MARTIN, Att'y for Defts.'

Which instruction was given by the Court, and which instruction so given, was then and there excepted to by the counsel for the plaintiff, who asked that this, his bill, might be sealed by the Court, which is done.

And thereupon, the Court further instructed the jury as follows, to wit:

"When lands are claimed by patent, or grant from the Government of the United States, and purchased at the several land offices from the plats there filed, and which are bounded by the Mississippi river, the purchaser cannot claim beyond the lines of the government survey, and must be controlled by lines and corners established and run by the government surveyors.

"To which said instructions of the Court so given, the said plaintiff, by his counsel, then and there excepted, and prayed that this, his bill of exceptions, might be sealed, which is done.

"SIDNEY BREESE.          [L. S.]"

"And afterwards, to wit, on the return of the verdict in said case, the said plaintiff, by his counsel, moved the Court for a new trial, for the following reasons:

"*First.* The verdict was against law.

"*Second.* The verdict was against evidence.

"*Third.* The Court erred in the instructions to the jury.

"Which motion for a new trial, the Court then and there overruled; to which decision of the said Court, overruling the motion for a new trial, the said plaintiff, by his counsel, then and there excepted, and prayed that this, his bill of exceptions, might be sealed, which is done.

"SIDNEY BREESE.          [L. S.]"

Township No. five north of the base line, in range No. ten west of the third principal meridian.

" The foregoing plats of townships and fractional townships, included between the third principal meridian and the middle of the Mississippi river, from the base line as far north as the north boundary of townships No. five north of the base line, have been examined by me.

" WM. RECTOR, Surveyor of the lands of the United States in the territories of Illinois and Missouri. Oct. 26th, 1816."
" To JOHN McKEE, Esq., Register of Land Office, Edwardsville, Ill."

" LAND OFFICE, Edwardsville, Oct. 8, 1841.
" I, Saml. H. Thompson, Register of the Land Office at Edwardsville, Illinois, do hereby certify, that the above plat of town-

Middleton v. Pritchard *et al.*

ship No. 5, N. of range 10 W., is correctly copied from the plat of the said township on file in this office, as is also the letter from Wm. Rector, Esq., Surveyor, to John McKee, Esq., Register.

"S. H. THOMPSON, Register of the Land Office."

Township No. five north, range ten west of the third principal meridian.

Copy of the field notes of the meanders of the Mississippi river through a part of township five north, range ten west of the third principal meridian.

"Meandered from the corner to fractional township No. 5 N., R. 10 W.; (*a* on map) thence up the Mississippi river, along the southerly boundary of fractional section 13, N. 58 deg., W. 10.50 chains; N. 62 deg., W. 4 chains; N. 60 deg., W. 30 chains; N. 63 deg., W. 16.50 chains; N. 67 deg., W. 10.50 chains; N. 81 deg., W. 17 chains, to corner to fractional 13 and 14 (*b* on map). Thence N. 78½ deg., W. 12 chains; N. 80½ deg., W. 15 chains; N. 62½ deg., W. 8 chains; N. 80 deg., W. 11.50 chains; (at 3.50 Little Piasa Creek, 100 links wide, bears S. E.) N. 68½ deg., W. 16 chains; N. 43 deg., W. 10 chains, to corner to fractional sections 10 and 11 (*d* on map)."

"SURVEYOR'S OFFICE,
"Saint Louis, 10th February, 1842.

"The above meanders of fractional sections 13, 14 and 11, T. 5 N., R. 10 W. of the 3d Pl. Mn., are correctly copied from the original notes thereof, on file in this office.

"JOS. C. BROWN, Surveyor of the public lands
for the district of Illinois and Missouri."

The following plat and explanatory memoranda were filed in the case by agreement:

"Plat of the southeast fractional quarter of section No. 13, of township No. 5 north, range 10 west of 3d principal meridian, as surveyed for William Manning, Esq., of Alton, by Jos. Burnap, surveyor.

" The place of the old corner at the termination of range line on the river, at A, cannot be with certainty determined; there is some evidence that the place of it is about 110 links south of the top of bank, represented by dotted line. The distance from top of bank to edge of river, at ordinary stage of water, at which the growth of trees terminate, is about 160 links. The old corner was evidently south of the top of the bank. The examination in reference to the foregoing described corner, was made the 23d day of October, 1841.

" JOSEPH BURNAP, Surveyor."

" The meanders of the Mississippi river, along the southeast fractional quarter of section No. 13, T. 5 N., R. 10 W. 3d P. M., of which the above plat is a representation, have been traced by the undersigned, according to a certified copy of the original field notes of the same, at the surveyor's office at St. Louis; and have

been found to run nearly parallel with the high bank represented above by the dotted line. Consequently, if the place of the old corner be some two or three rods south of the top of the high bank, as is probably the fact, the meanders would generally run about the same distance south of the top of the bank, as above described.

"Alton, April 11th, 1842.          J. BURNAP, Surveyor."

" The diagram below has reference to, and is explanatory of, the plat above, being the levels of five cross lines from the top of the bank, represented above by a dotted line to the island at the points above numbered 1 to 5, to which the diagram below corresponds. The distances and heights are given in feet and decimal parts. The top of the bank at dotted line, at No. 5, is 6 feet higher than at No. 3, and 3 feet higher than at Nos. 1 and 2. The levels of each cross section, run from the top of the bank at the several points at which they are taken."

| 1 | 300 ft. 2 | 250 ft. 3 | 300 ft. 4 | 350 ft. 5 |
|---|---|---|---|---|
| 5.30 | 6.8 | 6.00 | 6.10 | 9.20 |
| 9.00 | 10.00 | 8.60 | 8.20 | 13.00 |
| 11.40 | 12.70 | 11.70 | 10.30 | 17.10 |
| 13.50 | 9.00 | 5.70 | 13.20 | 21.60 |
| 11.12 | 9.10 | Height of island. | 9.10 | 19.20 |
| 8.50 | 11.05 | | Height of island. | 14.30 |
| 11.50 | 14.80 | | | Height of island. |
| 11.30 | 13.10 | | | |
| 11.90 | 7.50 | | | |
| 14.70 | Height of island. | | | |
| 12.30 | | | | |
| 7.90 | | | | |
| Height of island." | | | | |

The errors assigned are,

1. The refusal to give the several instructions requested by the plaintiff;

2. The giving of the instructions asked by the defendants;

3. The giving the further general instruction not asked for by either party; and

4. The refusal to grant the plaintiff's motion for a new trial.

JUNIUS HALL, for the appellant:

" The great and important question presented by the assignment of errors in this case is, what incidents attach in this State, to the private ownership of soil, or land lying upon the Mississippi river, and what is the extent of such ownership? Besides the common law distinction of rivers, which is into such as are and are not navigable; the term navigable being used in a technical sense, and signifying those rivers only where the tide ebbs and flows, and which are sometimes known by the designation of arms of the sea, rivers

Middleton *v.* Pritchard *et al.*

have a farther distinction, into public and private; public being such, as to their use, and private as to their propriety. Private being such, both as to use and propriety. The rule of the common law in regard to riparian ownership is, that rivers not navigable belong to the owner of the soil adjacent, to the extent of their land in length; that where the opposite banks are held by different persons, each holds *ad medium filum aquæ*, and that this ownership is limited or restrained in public rivers, i. e. in rivers where boats and vessels may be floated; in this, the public have a right of way or easement, and the private ownership cannot be exercised but in consistence with this public right. Rivers navigable, or where the tide ebbs and flows, belong to the State, and the private ownership of the soil adjacent, is limited to high water mark. The right of property to the shore and maritime *incrementa*, belong to the king. This is the doctrine of the common law. It dates back as early as the days of Bracton, and has been uniformly adhered to in all the English decisions. The treatise of Sir Matthew Hale, *De Jure Maris*, is the text book on this subject oftenest referred to, and the authority of which is never brought in question. It contains a concise and clear statement of the law as it exists, with the incidents growing out of it, and is as full and explicit on all questions of riparian rights, as is necessary. See Hargrave's Law Tracts, 5, 6.

" The civil law, on this head, is essentially the same with the common law. Its expression growing out of the peculiar division of things it had adopted, is different, but the idea is the same. Like incidents attached to the private ownership of the soil on the public rivers, and the extent of this ownership, in all its really beneficial and practical results, was equal to that under the common law. See Cooper's Justinian, p. 74, lib. 2, tit. 1. Spain adopted this part of the civil law in its fullest extent; and France, in a slightly modified degree only. See Hall's Tracts, Livingston's Answer to Mr. Jefferson, in the New Orleans Batture Case, 33–38, and 52.

" Similar incidents also attached to riparian proprietorship, by the Gentoo laws. See Code of Gentoo Law, c. 12.

" The doctrine would seem, therefore, to be equally well supported by its antiquity, and the universality of its acceptance, as by the reasonings on which it is based.

" The common law rule, as to riparian rights, is the American rule. In thirteen out of seventeen of the States, where questions have arisen for judicial determination, the Courts have adopted the law in its fullest extent. The cases will be found collated in the learned note appended to the case of *ex parte* Jennings, 6 Cowen 537.

" The high character, for profound wisdom and extensive legal learning, which the Courts in most of these States have always sustained, gives additional force to their adoption of the law. 2 Conn. 481; 3 Caines 315; 17 Johns. 195; 4 Pick. 268; 5 Har. and Johns. 195; 4 Mason 397.

" The Pennsylvania doctrine is a repudiation of the common law. 20 Johns. 100.

" In this State, by our adoption of the common law, we have made its doctrine as to riparian rights the governing rule. The ordinance of the 13th of July, 1797, contains no clause either expressly or impliedly abrogating this rule ; nor does it give to the navigable rivers within the territory governed by it, any incidents which do not belong to rivers in general. The expressions used in this ordinance, and in the several acts authorizing surveys of lands in the North West Territory, that certain navigable waters " shall be common highways, and forever free," or " public highways, and forever free," give to them no new character, nor in any way interfere with private rights. See Collection of Laws, Opinions, and Instructions relative to the Public Lands, entitled " Public Lands," Part 1st, 54, § 9, 56, § 6, 98, § 17, 187, § 3, 195, § 12 ; 3 Ohio 496. The term " common or public highway," as employed, denotes the right of the public to use the waters for carrying purposes. It is in fact declarative of the common law principle, and is by no means inconsistent with the private rights of riparian owners, to the extent that they exist under that law. See title Highways, 3 Kent's Com. 432, and the cases referred to in the note. The Alabama decision on this point, to be found in 2 Porter 436, seems to involve an absurdity, since it makes the right of way to depend upon, and be inseparable from, the ownership of the river's bed. Nor can it be urged that the terms and nature of the grant, in this case, except it from the operation of the common law rule. The land was sold by the numbers of the governmental survey. Its quantity, in acres, was estimated to determine the price. But the number of acres does not determine or limit the grant. This is fixed by the boundary lines, which are returned in the plat of survey which the law requires the Surveyor General to make to the land office of the proper district. By this plat the sale is made, and the purchaser is governed by it. It defines to him his boundaries. In this case, as in all cases upon the larger water courses, the river is, as appears, one of the boundaries. The meandering line, run for purposes of computation, is no part of the plat. Public Lands, Part 1, 55, § 1, 120, § 2, 226 ; also Part 2, 190, 379, 281, No. 220, 468, No. 395, 758, No. 720 ; 6 Cowen 706 ; 10 Peters 717 ; 6 Peters 498, 431.

" The fact that the United States Government has granted islands in the rivers, does not justify the conclusion that the principle of the common law is inapplicable, or has been repudiated. 13 Wend. 355. There must appear something, either in the plat of surveys, or in the grants themselves, showing an intention to reserve the islands to save them from passing with the adjacent lands. 6 Cowen 518, 589 ; 1 Paige 447 ; 5 Har. and Johns. 195.

" But it is sufficient in this case, should the rule be established, that the riparian owner holds only to low water mark ; and on this

point, there is no conflict of opinion. In those States where the common law rule has been rejected, the decision has invariably been, that the riparian owner holds to low water mark. There is no reason why he should be limited by the high bank, or high water mark, since this would be, not unfrequently, to bar all easy access to the river, and to deprive him of the very benefits sought in the purchase. 4 Peters' Cond. R. 691 ; 2 Porter 436 ; and case of Lessee of Blanchard *v.* Collins *et al.*, a recent decision in Ohio.

"On either ground, therefore, whether it be determined that the riparian proprietors hold, *ad medium filum aquæ*, or that he holds to low water mark, it would seem that the decision of the Court below ought to be reversed."

N. D. Strong argued on the same side.

William Martin, for the appellee.

Scates, Justice, delivered the opinion of the Court:
*Trespass* for cutting and carrying away timber. The title was admitted to be in the plaintiff to the east half of fractional section thirteen, township five, north of the base line, and range ten west of the third principal meridian. The defendants admitted the cutting and carrying away the timber from an island, or peninsula of land in front of the above premises, and separated from it by a slough ; but deny that the *locus in quo* is included in, and part of, the above fractional half section; and this is the only question for the determination of this Court.

The Court below refused instructions asked by the plaintiff, and gave instructions for the defendants, and also refused the plaintiff a new trial.

The eastern boundary line of the east half fractional section above mentioned, extends to the bluff bank of the Mississippi, below this island or peninsula, and at that point there is a bearing tree. There is no bearing tree to be found, where the other lines of said section reach the river.

The island or peninsula is separated from the main land by a slough, formed by a gradual slope from each side, through which the water of the river runs two or three months in the year. The main land is overflowed in high water. In low water the slough is dry, except some pools of standing water ; and is filled with driftwood. The timber on the island and main land approaches within two or three rods of each other ; part of the bed of the slough produces grass. The island and slough have not changed for the last thirty years. They are not marked or mapped upon the plat of the government surveys. But it appears the surveyor of the government traced the courses and distances along the margin of the slough, next the main land, in order to estimate the quantity of land in the fraction ; and which estimate did not include the *locus*

*in quo.* But the plats in the land office, and Surveyor General's office, have no line marking these courses and distances as a boundary. They are taken from the field notes of meandering, in the Surveyor General's office. The plaintiff claims to be bounded by the river, and as riparian proprietor, entitled to extend *ad medium filum aquæ.* The grant is to be taken most strongly against the grantor. Where the Government has not reserved any right or interest that might pass by the grant, nor done any act showing an intention of reservation, such as platting or surveying, we must construe its grant most favorably for the grantee, and that it intended all that might pass by it. What will pass then by a grant bounded by a stream of water? At the common law, this depended upon the character of the stream, or water. If it were a navigable stream, or water, the riparian proprietor extended only to high water mark. (1) If it were a stream not navigable, the rights of the riparian owner extended to the centre thread of the current. (2) In the former case, the King or the Government is owner of the water, and the soil covered by it, for purposes of navigation, public and common to all for navigating or fishing, unless the King had this latter right exclusively; and the soil between low and high water mark, is a public common, for like purposes and uses. (3) In the latter case, the water, and the soil under it, to the centre of the current, as well as the right to fish there, are exclusively in the riparian owner. (4)

But to understand more fully the application of these principles to riparian ownership, it is necessary to advert to the distinction at common law, between streams navigable *de facto,* and those deemed to be so in law.

At common law, only arms of the sea, and streams where the tide ebbs and flows, are deemed navigable. (5) Streams above tide water, although navigable in fact at all times, or in freshets, were not deemed navigable in law. (6) To these, riparian proprietors bounded on or by the river, could acquire exclusive ownership in the soil, water and fishery, to the middle thread of the current; (7) subject, however, to the public easement of navigation. (8) And this latter Chancellor Kent says, bears a perfect resemblance to public highways. (9) The consequence of this doctrine is, that all grants bounded upon a river not navigable by the common law, entitle the grantee to all islands lying between the main land and the centre thread of the current. (10) And we feel bound so to construe grants by the Government, according to the principles

(1) 5 Cowen 518, and note; 3 Kent's Com. 427, and authorities cited in both.
(2) 6 Cowen 537, chap. 3 of note; 3 Kent's Com. 427.
(3) 6 Cowen 539, note, chap. 3; 3 Kent's Com. 430; 3 Ohio 496; 5 Wend. 463.
(4) 6 Cowen 537, note, chap. 1.
(5) 6 Cowen 540, chap. 4; 5 Wend. 443, 463,     (6) 6 Cowen 537, note.
(7) 4 Pick. 268; 5 Harris & Johns. 195; 7 Mass. 495; 3 Ohio Rep. 495; 5 Wend. 423.
(8) 3 Kent's Com. 427, &c.; 6 Cowen 537, note; 6 Wend. 444.
(9) 3 Kent's Com. 432.     (10) 3 Kent's Com. 430.

of the common law, unless the Government has done some act to qualify or exclude the right. The maps, plats, and field notes of the governmental surveys, by reference, become a part of the evidences of title, to enable the grantee to identify his boundary and lands. So where islands are marked, mapped, platted, or surveyed; or where lines are distinctly drawn on the plat, as bounding the front on rivers, lakes, or other waters; these distinct acts of the grantor, must explain, qualify, control, or determine the interpretation, construction, and extent of the grant.

Shall these common law principles be applied to such streams as the Mississippi, Ohio, Wabash, and Illinois? It is true there were no such navigable rivers above tide water in England, where these principles were first laid down, and applied to their waters; and several of the States have repudiated these doctrines as inapplicable to the large inland navigable streams of this country. (1) And many of the States, having similar streams, have adopted them. (2)

The United States have not repealed the common law as to the interpretation of their own grants, nor explained what interpretation or limitation should be given to, or imposed upon the terms of the ordinary conveyances which they use, except in a few special instances; (3) but these are left to the principles of law, and rules adopted by each local government, where the land may lie. We have adopted the common law, and must, therefore, apply its principles to the interpretation of their grant. The United States have applied them to grants upon the Ohio river, extending the riparian ownership to low water mark, the boundary of jurisdiction, as well as the United States' ownership of the land. (4) The Government itself, through its agents, has recognised and applied the same principles. (5)

If the riparian owner cannot extend into the river, he must be bounded by high water mark, leaving as a public common, all the space between that and low water mark. This would destroy the great value of river front lands, by excluding the proprietor from its exclusive use in keeping wood-yards, erecting private wharves, or buildings, which are of greater or less value, according to their location and the depth of water. We would not, however, wish to be understood as limiting the rights of navigators, to the bare

(1) 2 Binn. 476; 2 Porter 440; 1 McCord 580; 14 Serg. & Rawle 71; 2 Dev. 30; 3 Dev. 59.

(2) 6 Cowen 518; 3 Caines 319; 2 Conn. 481; 20 Johns. 91; 17 Johns. 209, 195; 1 Halstead, N. J., 1; 6 Mass. 438; 13 Wend. 355; 4 Pick. 268; 5 Harris & Johns. 195; 7 Mass. 495; 3 Ohio 495; 5 Wend. 423; 3 Greenl. 269, 474; 13 Maine 201; 1 Rand. 417; 3 Rand. 33; 6 Martin 19.

(3) *See* Public Land Laws, part 1, pp. 54, 56, 98, 107, 187, 195, 216, 310, 365, making certain streams not navigable, common to the proprietors on each bank.

(4) 4 Peters' Cond. R. 691; Lessee of Blanchard *v.* Porter Collins *et al.*, MS. Opin. Sup. Ct. Ohio.

(5) U. S. Land Laws, part 2, 758, No. 720; *Ibid.* part 1, p. 120, § 2; p. 379, chap. 298, § 1.

privilege of floating upon the water, in the use of the public ease-ment ; but understand it to include the right to land, and fasten to the shore, as the exigencies of the navigation may require; and this is a burthen upon the owner of the land which he must bear as part of the public easement. (1)

It is denied that this land is bounded upon the river. We think there can be no question on that point ; the fact appears so clear. There is no line upon the maps or plats, nor any direction in the field notes, nor any other visible monument to define and desig-nate the southern boundary of the tract. (2) It is true, the field notes of the meandering of the front of this tract, speak of it as the southerly boundary. But as I before remarked, the meandering is for the purpose of ascertaining the quantity of land. Should it be incorrect, still it would not entitle the party to a re-survey and new estimate. It is sold more or less. If there be more, the pur-chaser gets it; if it be less, he loses it. This, therefore, cannot control. (3) Many of the cases on this question of river boundary are much stronger for the plaintiff than the one before us.

All alluvions belong to the riparian proprietor, both by the com-mon and civil law. (4) The same holds as to losses, by gradual washing away. But where a sudden change is made in the course of the river, so as to cut off a portion of one man's land, he still retains the right and title to it.

We are therefore of opinion that the Court misdirected the jury, and that a new trial ought to be granted.

The judgment is reversed with costs and the cause remanded, with directions to award a *venire de novo.*

WILSON, Chief Justice, delivered the following separate opinion :

I concur in the decision of this case, and in the general princi-ples laid down by the Court, but I cannot concur in the conclu-sions drawn from them. A grant of land upon a river, extends the title of the grantee to the middle of the same, if the grantor has authority to extend it so far, unless limited to another boundary by express terms. This is a general principle of the common law applicable to private conveyances, which are construed most strongly against the grantor. But there are exceptions to this rule. It does not apply to boundaries of States, or countries, nor in England, to grants made by the crown, and in this country, I think, the rule must be so far modified as not to allow a patent from the Government to land on the margin of one of our rivers, to include the islands between the shore and the middle of the stream. This opinion is founded upon a consideration of the power of the agents of the Government, who sell the public lands, and the intention of

(1) 13 Wend. 355; 3 Kent's Com. 425; Civil Code Louisiana, Art. 443-6. So in Spain and France. *See* Kent's Com. *Ubi Supra.*
(2) 14 Mass. 151. (3) U. S. Land Laws, part 1, p. 120, § 2.
(4) Cooper's Just. 74; 6 Cowen 518, note, and authorities there referred to.

the Government, as to the extent of those sales, in reference to islands.

If an island is not surveyed and platted, or otherwise marked upon the surveyor's map, it is said that it will pass to the purchaser of the land on the margin of the river opposite to it, if it lies between such land and the middle of the river. The first objection to such an interpretation of a sale of land upon a river, by the agents of the Government, is a want of authority in them to give it so extensive an operation. The land authorized to be sold, and the mode of selling it, is prescribed by law, and all sales in violation of that, are void. Among the regulations prescribed by law, as indispensable preliminaries to a valid sale of any part of the public lands, are, that the lands shall be surveyed and platted; and these surveys and plats are the guides of the land officers in making their sales. They have no authority to sell a single acre that has not been surveyed. Every tract of land liable to sale, is specifically described by range, township, and section, &c., on the plats of the surveyor, and in the patents from the United States; and the officers have no authority to sell any other land. It follows, therefore, as a necessary consequence, that islands, as well as other lands, that have not been surveyed and platted as the law requires, cannot be sold. It has no description known to the law. And as such lands or islands cannot be sold directly, by numbers, as other lands are, it is clear to my mind, that they cannot pass as incident to the sale of other land. That cannot be effected indirectly, and by intendment of law, which the law expressly forbids.

Another reason against a purchaser from the Government of land on the margin of a river, acquiring title to islands between his land and the thread of the stream, is that neither the Government, nor purchasers understand or intend, that islands in a river pass by a sale of the land on the nearest shore. It is part of the history of the country, as it is of the law of the land, that the public lands are surveyed at different times; and the land on one side of a river may be sold, before that on the other side, or any of the islands in it are surveyed, and under these circumstances, all the islands between the middle of the river and the shore, adjoining the land sold, would go to the purchasers of such land, according to the rule insisted upon by the Court. Such would also be the consequence of a sale of the lands on both sides of a river before the islands are surveyed. That no such consequences were intended by the Government, is apparent from its public acts. The public lands are sold from time to time, as the exigencies of the Government, or the wants of the people require; and frequently the islands (many of which are of great value,) remain unsurveyed until after the lands on each side of the river have been sold. They have then been surveyed and sold without any claim of title by the owners of the lands on either side of the river.

This unquestioned claim of title to unsurveyed islands by the

Government, notwithstanding the previous transfer of the lands on the opposite sides of the river, coupled with the constant practice of surveying and selling them without reference to the sale of adjoining lands, should, in my opinion, be regarded as fixing the construction of a government patent for lands lying on a river, so as to exclude the opposite islands, whether surveyed or unsurveyed.

It is by implication, that a grant or patent of land upon a river, includes the islands to the middle of the same; but the patent itself cannot be so interpreted, because its terms do not describe the land as bounded by the river; and a reference to the plat will not show an unsurveyed island to be included, because such are not marked upon the map.

From the consideration that the terms of the patent will not justify such a construction as to include unsurveyed islands, taken in connection with the want of authority on the part of the officers making the sale, to sell any land except such as has been surveyed, platted, and advertised, &c., according to law, and considering also the long continued practice of the Government to survey and sell the islands in our rivers, from time to time, without its authority being ever questioned by the prior purchasers of the land upon their margins, I am constrained to dissent from so much of the opinion of the Court, as gives to a purchaser of public land upon a river, the unsurveyed islands in the same, between such land and the middle of the stream. These islands are not necessary to the full enjoyment of the advantages of a river situation, as the water, the land upon its margin, and that covered with water to its centre, are; and the legal implication that would carry the boundary of a grant of land upon a river to its centre, cannot be deduced from the terms of a patent; but on the contrary, such implication is rebutted by the intention of the parties, as evinced by the long continued practice on one side, and an equally long acquiescense of the other.

*Judgment reversed.*