(March 23, 1908.)

O. P. JOHNSON, Appellant, v. WM. M. JOHNSON and WALTER GRIDLEY, Respondents.

[95 Pac. 499.]

ACTION TO QUIET TITLE—GOVERNMENT SURVEY—BOUNDARY LINES—RI-
PARIAN OWNERSHIP—STREAMS AS PUBLIC HIGHWAYS—EASEMENTS—
NAVIGABLE STREAMS.

1. Under the provisions of secs. 2395 and 2396, U. S. Rev. Stat., public lands are to be surveyed into townships six miles square, and each in turn subdivided into thirty-six sections of a mile square, except where a line of an Indian Reservation, or the tracts of land theretofore surveyed or patented, or the course of navigable rivers may render this impracticable, and in that case, this rule must be departed from no further than such particular circumstances require.

2. Where lands front upon navigable streams, and a line meandering the margin of such stream is run for the purpose of ascertaining the quantity of land to be paid for, such meander line is not regarded as a boundary line, but only points out the sinuosities of the bank for the purpose of arriving at the area of land to be paid for.

3. Under the common law, the title to the soil under tide water was in the king, his title extending as far as the tide. In non-

tidal streams, whether navigable or not, the title in fee to the bed of the stream was in the riparian owner; but if the stream be navigable in fact, the public had an easement or right of passage over and along such stream.

4. Under the common law, a riparian proprietor bounded on or by a stream above tide water, although navigable in fact, acquires exclusive ownership in the soil to the middle thread of the current, subject to the public easement of navigation; and all grants of the government bounded upon or by such stream entitle the grantee to all islands lying between the main land and the center thread of the current, unless it appears, either from the grant itself or from other circumstances surrounding the same, that the government intended to reserve such island from such grant.

5. When the government grants land for a consideration, and does not reserve any rights or interests that would ordinarily pass by the rules of law, and does no act which indicates an intention to make such reservation, the grant includes all that would pass by it if it were a private grant.

6. Where the government grants land bordering upon a navigable stream, that is, a fresh-water stream not affected by the ebb and flow of the tide, and there is nothing in the grant or in the acts of the government which indicates an intention upon the part of the government to make any reservation or limit the grant to the water's edge, the grantee takes to the middle of the main channel of such stream.

7. In this state the doctrine is announced and adopted, that a riparian owner upon the streams of this state, both navigable and non-navigable, takes to the thread of the stream, subject, however, to an easement for the use of the public.

8. Sec. 2476, U. S. Rev. Stat., provides: ''All navigable rivers, within the territory occupied by the public lands, shall remain and be deemed public highways; and in all cases where the opposite banks of any streams not navigable belong to different persons, the stream and the bed thereof shall become common to both.'' Under this section the waters of navigable rivers within the territory specified are declared to be public highways; but said section does not reserve the bed of the stream, but does declare that when the opposite banks of any stream, not navigable, belong to different persons, the stream and the bed thereof shall become common to both.

9. This act of Congress means that navigable streams, within the territory to be disposed of, shall be deemed to be and remain public highways, subject to the public easement; that the public should enjoy its free and uninterrupted navigation, unobstructed by dams, bridges, or other structures which might impede its commerce; the intention of Congress being to reserve the use of the rivers for the public without interference with the riparian owner, and the latter

to have his right to the bed of the stream without interference with the *jus publicum.*

10. In this state all streams which are capable of being used for the purpose of carrying boats, passengers, freight, floating logs, timber, wood, or any other product, to market, are recognized and declared to be navigable streams, the beds of which remain in the riparian owner subject to a public easement.

11. The fact that navigable rivers are reserved as public highways in no way interferes with the legal doctrine that the riparian owner takes to the thread of the stream.

12. The public have an easement in, and the right to use, the navigable streams of this state, but in so doing, must have due consideration and reasonable care for the rights of the riparian owner, whose right to use a stream implies the necessity as well as the right to pass to and from such stream.

(Syllabus by the court.)

APPEAL from the District Court of Fourth Judicial District for Lincoln County. Hon. Alfred Budge, Judge.

Action to quiet title. Judgment for defendants. *Reversed.*

E. M. Wolfe, for Appellant.

If the land that the defendants claim is in excess of the acreage mentioned in our patent, that fact alone does not prevent it passing under the patent. (*Johnson v. Hurst,* 10 Ida. 308, 77 Pac. 784.) The government does not contemplate surveying every little piece of sandbar or island along meandering streams, but does intend to convey the land on each side of the stream to the center thereof. (*Ingraham v. Wilkinson,* 4 Pick. (Mass.) 268, 16 Am. Dec. 342, and cases cited.)

All islands on the banks of rivers pass to the owner of lots abutting on the river at that point. (*Whitaker v. McBride,* 197 U. S. 510, 25 Sup. Ct. 530, 49 L. ed. 857; *Stoneroad v. Stoneroad,* 158 U. S. 240, 15 Sup. Ct. 822, 39 L. ed. 966.)

The Snake river in Idaho is a non-navigable stream, according to the common law, and the court should take judicial notice of that fact. (*People v. Truckee Lumber Co.,* 116 Cal. 397, 58 Am. St. Rep. 183, 48 Pac. 374, 39 L. R. A. 581;

*Hardin v. Jordan,* 140 U. S. 371, 11 Sup. Ct. 808, 35 L. ed. 428.)

If the Snake river is a non-navigable stream the patent conveyed the land on each side to the thread or middle of the stream. (*Grand Rapids & Ind. R. Co. v. Butler,* 159 U. S. 95, 15 Sup. Ct. 991, 40 L. ed. 85; *Luce v. Carley,* 24 Wend. (N. Y.) 451, 35 Am. Dec. 637.)

Under the statutes of our state, sec. 2934, Rev. Stat., a transfer of land bordering on a highway passes the title of the soil to the center thereof. If the Snake river is navigable, it is a highway, and the land under the above section would belong to the grantee, to the center of the stream.

Sullivan & Sullivan, for Respondents.

The rule is well established that the water line and not the meander line is the true boundary. (*Johnson v. Hurst,* 10 Ida. 308, 318, 77 Pac. 784; *County of St. Clair v. Lovington,* 90 U. S. 46, 23 L. ed. 59.)

In the Johnson-Hurst case this court held plaintiff took to the "stream." The proof shows that the perpendicular bank and water line are at the same place—in other words, that the bank is a bluff or rim-rock and the water line comes up to its base. We have proved beyond any doubt where the stream is, by proving both the north bank and the north water line, and that Weatherby Island is south of the north line of the stream. When there exists a difference between the meander line as run and the actual margin of the stream, the water is the true boundary. (*Horne v. Smith,* 159 U. S. 40, 15 Sup. Ct. 988, 40 L. ed. 68.)

This court has virtually decided that Snake river in the vicinity in question (within one township) is a navigable stream. (*Johnson v. Hurst,* 10 Ida. 323, 77 Pac. 784.) It appears to us that the court in that decision took judicial notice of the fact that Snake river in that vicinity was a navigable stream. If not, why was Johnson given title to the stream only? If this court had taken judicial notice that

it was a non-navigable stream, it would have given him to the center thereof.

All the cases cited by plaintiff are where lands border on non-navigable streams, and are, therefore, not in point in this action. An equal number of authorities might be cited which hold that where land borders on a navigable stream, one will take to the stream or water line only.

STEWART, J.—This is an action to quiet title to lot 6 in sec. 6, in township 8 south, of range 14 east, and lots 6 and 7 in sec. 1, township 8 south, of range 13 east, Boise meridian, in Lincoln county. The real controversy, however, involves lots 6 and 7 in sec. 1, township 8 south, of range 13 east. The plaintiff alleges title in fee; that one William McCandless obtained title to said property by patent and conveyed the same to this plaintiff by a warranty deed; that the defendants claim some interest or estate in said property, but that such claim is without any right whatever. The complaint alleges, also, that the defendants have entered upon a part of said land and planted a crop, and have dug up ditches and ruined and destroyed plaintiff's fences, and will continue to do so unless restrained by the court. The plaintiff asks judgment requiring the defendants to set forth the nature of their title, and that the court declare the plaintiff to be the owner of said premises, and that the defendants have no interest therein.

The defendants answered and denied that they claim any estate in said property, unless such premises include an unsurveyed island known as Weatherby Island, situated in Snake river in sec. 1, township 8 south, range 13 east, Lincoln county, Idaho, in which defendant, Walter Gridley, admits that he claims some interest in said property and avers that he is the owner of what is known as Weatherby Island, and denies that the defendants have entered upon the land of the plaintiff, or planted a crop thereon or dug up or destroyed ditches or fences. As an affirmative defense, the defendant, Walter Gridley, alleges that he and his predecessors in interest have been in the exclusive, open, continuous, notorious

and quiet possession of what is known as Weatherby Island for more than five years prior to the commencement of this suit.

The cause was tried by the court and findings of fact and conclusions of law were made and a judgment entered in favor of defendants. The plaintiff appeals from the judgment.

The real controversy involves the south boundary line of lots 6 and 7 in sec. 1. These lots lie along the north bank of Snake river. In the findings of fact the court found that the plaintiff was the owner of lot 6 in sec. 6, township 8 south, of range 14 east, and lots 6 and 7 in sec. 1, township 8 south, of range 13 east, Boise Meridian; that it appears from the official plat of the United States land office, that all the lands within the legal subdivision of sec. 6, township 8 south, of range 14 east, and said sec. 1 of township 8 south, of range 13 east, had been returned to the government as surveyed, and that the remainder of the subdivisions of said sections are shown to be the waters of Snake river, and that the government issued its patent to the predecessor of plaintiff for the fractional subdivisions heretofore described, abutting on a line which purports to meander said stream; that said meander line, on the south of said lots, does not, in fact, meander said north bank or water line of Snake river; that said lots abut on said Snake river, and are bounded on the south thereby; that the said north bank of Snake river, south of said lots, is a well-defined perpendicular bluff or rim-rock; that the north water line of said Snake river, south of said lots, is at the base or foot of said bluff or rim-rock; that said lots extend only to the north water line of said Snake river, which is at the base or foot of said bluff or rim-rock; that defendants are not occupying or claiming any estate or interest in or to said above-described lots or any part thereof; that the defendant, Walter Gridley, is the owner and entitled to the possession of that certain unsurveyed tract of land known as Weatherby Island in sec. 1, township 8 south, of range 13 east; that said tract of land last described is an island in Snake river, and is partly opposite said lots 6 and 7 in sec. 1; that said island, nor any part thereof, is included

in said lots owned by plaintiff herein; that the defendant, Walter Gridley, and his predecessors have been in possession of and occupying said island for more than ten years immediately preceding the commencement of this action.

As conclusions of law, the court finds that the meander line of said Snake river, south of said lots owned by the plaintiff herein, is not the true boundary line thereof, and the plaintiff, by virtue of the patent to said lots, and the conveyance to him by the patentee, only takes title to the north water line of said Snake river, and that said plaintiff did not, therefore, acquire any estate or interest in or to said Weatherby Island; that the plaintiff is entitled to have his title quieted in said lots under a proper description, showing that said lots do not include said Weatherby Island.

Upon these findings, the court rendered a decree quieting the plaintiff's title to the property described in the complaint, bounded on the south by the north water line of Snake river, which is fixed at the foot or base of the north bank of said river as shown by a perpendicular bluff or rim-rock.

A number of errors are assigned by the appellant, but they in effect involve the question as to whether or not the south boundary line of lots 6 and 7 in sec. 1 as described in the plaintiff's complaint is the high-water line of Snake river, as found by that court. The appellant also contends that there was no island in Snake river as claimed by the defendants, under the name of Weatherby Island, but if there was such island, that the same is a part of said lots 6 and 7 as claimed by plaintiff. The plaintiff introduced in evidence in this case the official plat of the land office, embracing the lands involved in this controversy, which official plat shows that all of sec. 1 in which said lots 6 and 7 are a part, was surveyed by the government, and that no island whatever is shown in Snake river in front of said lots. It also appears in this case, without contradiction, that the main channel of Snake river flows to the south of what is termed as Weatherby Island, or upon the opposite side of said island from said lots 6 and 7.

Under the provisions of secs. 2395 and 2396 of the Rev. Stat. of the United States (U. S. Comp. Stat. 1901, pp. 1471-1473), it is provided that the public lands shall be surveyed into townships six miles square, and each in turn subdivided into thirty-six sections of a mile square, except where a line of an Indian Reservation or of the tracts of land theretofore surveyed or patented, or the course of navigable rivers may render this impracticable; and in that case, this rule must be departed from no further than such particular circumstances require. The patent to Wm. McCandless, the grantor of plaintiff, was for lots 6 and 7, sec. 1, township 8 south, range 13 east, and lot 6, sec. 6, township 8 south, range 14 east. The boundary lines for lots 6 and 7, sec. 1, are not set out in the patent, but reference is made to the official plat of the survey of said lands for identification of the land granted, thereby adopting the plat as a part of the instrument. The patent reads, "according to the official plat of the survey returned to the general land office by the surveyor general." By referring to the official plat marked in this case as "Plaintiff's Exhibit 4," we find that all the lands bounding lots 6 and 7, covered by said patent, are straight except the line bordering on Snake river.

It has always been the policy of the government, as we understand it, where lands front upon navigable streams, to measure the price of the lands conveyed by the quantity of upland granted, and to require no payment for lands covered by the waters of streams or lakes, and for the purpose of ascertaining the quantity of upland to be paid for, a line meandering the margin of such waters is run, and, where this is the purpose of running such a meandering line, it is not regarded as a boundary line, but only points out the sinuosities of the bank, for the purpose of arriving at the area of land to be paid for. (*Johnson v. Hurst,* 10 Ida. 308, 77 Pac. 784; *Railroad Co. v. Schurmeir,* 7 Wall. 272, 19 L. ed. 74; *Hardin v. Jordan,* 140 U. S. 371-380, 11 Sup. Ct. 808, 35 L. ed. 428; *Horne v. Smith,* 159 U. S. 40-43, 15 Sup. Ct. 988, 40 L. ed. 68.) The evidence in this case clearly shows that the body of land designated in the record as Weatherby Island, at ordi-

nary high-water season, is entirely surrounded by water, and at low-water season, the water of said Snake river passes entirely around the south border of said island, in the main channel of said stream, as a result of which the high-water line of said Snake river is along the rim rock to the north boundary line of said island. This line, the respondents contend, is the south boundary line of said lots 6 and 7 as owned by the plaintiff, and with this contention the trial court agreed.

Counsel for both appellant and respondents cite the case of *Johnson v. Hurst*, 10 Ida. 308, 77 Pac. 784, as authority sustaining their respective positions. An examination of that case, however, at once discloses the fact that it has no bearing upon this particular question. In *Johnson v. Hurst*, the question decided by this court was as to whom land lying between the meander line of a stream and the water line belonged, and this court held that where it appeared from the notes of the official plats that all the lands within the legal subdivision, as directed to be surveyed by the United States statutes, had been returned as surveyed, and the remainder of those subdivisions are shown to be the waters of a navigable stream, that the grantees to lots or fractional subdivisions abutting on the meander line take title to the stream.

In the case at bar, however, the question of title to the land between the meander line and the stream does not arise. The record in this case shows that the field-notes were introduced in evidence, but they were not brought to this court by the record.    As stated above, the plat showing the government survey of sec. 1 shows that the land not occupied by the Snake river was surveyed and there does not appear to be any island in Snake river in front of lots 6 and 7 in said section. The defendants, however, introduced in evidence a plat and survey of said sec. 1, made by one John Koets, county surveyor of Lincoln county, in which is shown an island consisting of twenty-five acres lying in Snake river, mostly in front of said lots 6 and 7 in said sec. 1.    This witness testifies that a rim of rock to the north of said island was the north bank of Snake river, and that while lot 6 is designated on the government plat as containing 26.55 acres, yet if said lot ex-

tends down to the north bank of Snake river, which he fixes as the rim-rock, there are 48.5 acres in said lot 6, or 8.5 acres more than a complete forty, and that while the government plat shows 17.85 acres in lot 7, he found in fact 18.5 acres. In other words, according to the government plat, there were 44.4 acres in said lots 6 and 7, while by actual survey he found there to be 67 acres in said lots 6 and 7, and that there are 25 acres in the island, which, if it belongs to the plaintiff, would give plaintiff 92 acres of land, or 47.6 acres more than is shown on the government plat. This witness also testifies that there is a small neck of land extending from the island out across the north channel of said Snake river to the main land, an average width of twenty feet, and that the water of said Snake river could get around the end of the neck or tongue at ordinary high water, and thus entirely surround said island with the waters of Snake river; that Riley creek flows over the rim-rock near the boundary line between lots 6 and 7, the waters of which empty into this north channel of Snake river, and during the low-water season the water flows east into the waters of Snake river and then around the south boundary line of said island, and that the tongue or neck referred to as extending from the island toward the main land is immediately west of the mouth of said Riley creek, and immediately below this neck or tongue are springs from which water rises and flows west into the waters of Snake river. We have recited these facts to show the true condition of the premises.

It can serve no purpose in this opinion for this court to review the decisions under the common law as to the boundaries of lands lying upon navigable waters. It is sufficient, however, to state that at common law a conveyance of land bounded upon a river or stream in which the tide does not ebb or flow, though navigable in fact, is presumed to carry title to the thread of the stream. (5 Cyc. 895; Farnham on Water and Water Rights, vol. 1, sec. 50; 4 Am. & Eng. Ency. of Law, 2d ed., 828.) And that in the United States, where the test of navigability is navigability in fact, the decisions with reference to boundaries of lands lying upon nontidal, navig-

able rivers are hopelessly in conflict. (5 Cyc. 896.) Much
of the conflict in the decisions of the various states arises out
of the application of the common law to streams navigable in
fact. Under the common law, only streams affected by the
ebb and flow of the tide were deemed navigable; while in this
country, streams navigable in fact are navigable streams. Ap-
plying the common law, then, to streams not affected by the
ebb and flow of the tide, although navigable in fact, the ripa-
rian proprietor takes to the thread of the stream. Under the
common law, the title to the soil under tide water was in the
king, his title extending as far as the sea. In nontidal
streams, whether navigable or not, the title to the fee or bed
of the stream was in the riparian owner, but if the stream be
navigable in fact, the public had an easement or right of pas-
sage over or along such stream. Under the common law, only
arms of the sea and streams where the tide ebbs and flows
are deemed navigable. Streams above tide water, although
navigable in fact at all times or in freshets, were not deemed
navigable in law. To these, riparian proprietors bounded on
or by the river could acquire exclusive ownership in the soil,
water and fishery, to the middle thread of the current, subject,
however, to the public easement of navigation. The conse-
quence of this doctrine is that all grants bounded upon a
river not navigable by the common law entitle the grantee to
all islands lying between the main land and the center thread
of the current. This was the doctrine announced by the su-
preme court of the United States in the case of *Hardin v. Jor-
dan,* 140 U. S. 371, 11 Sup. Ct. 808, 35 L. ed. 428, wherein
it quotes with approval from *Middleton v. Pritchard,* 4 Ill.
510, 38 Am. Dec. 112, as follows:

"We feel bound so to construe grants by the government
according to the principles of the common law, unless the
government has done some act to qualify or exclude the right.
. . . . The United States have not repealed the common law
as to the interpretation of their own grants, or explained what
interpretation or limitation should be given to or imposed upon
the terms of the ordinary conveyance which they use, except
in a few special instances; but these are left to the principles

of law and rules adopted by each local government, where the land may lie. We have adopted the common law, and must therefore apply its principles to the interpretation of their grant.''

In vol. 1, Farnham on Water and Water Rights, at page 249, and in 5 Cyc., page 895, the authors have classified the different states which follow the letter of the common law, the spirit of the common law, and those refusing to follow the common law. An examination of the authorities of the several states will at once impress the reader with the conviction that the authorities are in a hopeless conflict, and that the law-writers are even unable to determine accurately what the several courts have held. So it will be seen that in considering this question, we are confronted with an irreconcilable conflict of the law. This is the first time this question has ever been presented to this court for decision. What rule this court will adopt must depend upon what seems to be the most advantageous to the interest of the public and the private citizen in this new state. Some states have determined this matter by inserting a provision in the constitution; others by legislative enactment, but most of the states have merely adopted the common law, and by so doing have declared that the title to the bed of fresh water streams rests in the riparian owner. This conflict in the decisions in various states relating to the title to land under fresh water streams has arisen from either a failure to correctly comprehend the common-law principles applicable thereto, or a doubt as to the wisdom of applying such principles.

Under the provisions of sec. 18, Rev. Stat., the common law of England, so far as it is not repugnant to or inconsistent with the constitution or laws of the United States, in all cases not provided for in these Revised Statutes, is the rule of decision in all the courts of this state, unless the same conflicts with the constitution or laws of this state.

In the case of *Packer v. Bird*, 137 U. S. 661, 11 Sup. Ct. 210, 34 L. ed. 819, the supreme court of the United States, speaking through Justice Field, says:

"The courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the states for their grants; but whatever incidents or rights attach to the ownership of property conveyed by the government will be determined by the states, subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee. As an incident of such ownership the right of the riparian owner, where the waters are above the influence of the tide, will be limited according to the law of the state, either to low or high water mark, or will extend to the middle of the stream." (*Hardin v. Jordan,* 140 U. S. 371, 11 Sup. Ct. 808, 35 L. ed. 428.)

It appears from the government plat to which reference is made in the patent to plaintiff's grantor, that the government sold and conveyed all the land in lots 6 and 7 in sec. 1, bounded by the river on the south, and that no reservation whatever was made in said patent. No intention appears on the part of the government to reserve any land lying between said lots 6 and 7 and the river. The only conclusion that can be drawn from the actions of the government is that it intended to pass title to the plaintiff's grantor to all lands north of the main channel of said Snake river as a part of said lots 6 and 7, and that the government did not consider the island in question in this case of sufficient importance to reserve the same from said grant. (*Hardin v. Jordan, supra; Middleton v. Pritchard,* 4 Ill. 510, 38 Am. Dec. 112; *McBride v. Whitaker,* 65 Neb. 137, 90 N. W. 966; *Lamprey v. State,* 52 Minn. 181, 38 Am. St. Rep. 541, 53 N. W. 1139, 18 L. R. A. 670; *Butler v. Grand Rapids,* 85 Mich. 246, 24 Am. St. Rep. 84, 48 N. W. 569; *Horne v. Smith,* 159 U. S. 36, 15 Sup. Ct. 988, 40 L. ed. 68; *Harrison v. Fite,* 148 Fed. 781, 78 C. C. A. 447.) This, we think, is the true doctrine, unless sec. 2476, Rev. Stat. of the United States (U. S. Comp. Stat. 1901, p. 1567), hereinafter discussed, calls for a different conclusion.

This precise question arose in the case of *Chandos v. Mack,* 77 Wis. 533, 20 Am. St. Rep. 139, 46 N. W. 803, 10 L. R. A. 207, and the court says: "The inference certainly is very

strong, when the government leaves a small island in a navigable river, lying between the shore and middle of the stream, unsurveyed, and sells all the surveyed islands and all the land on both sides of the river, that it intends to abandon all right to such unsurveyed island, and let it pass to the riparian owners of lands on the river as an incident to its grant.''

This case quotes with approval the case of *Middleton v. Pritchard,* 4 Ill. 510, 38 Am. Dec. 112, in which the supreme court of Illinois held: ''That when a government grant is made which does not reserve a right or interest that would ordinarily pass by the rules of law, and the government does no act which indicates an intention to make such reservation, the grant includes all that would pass by it, if it were a private grant; and that as the United States has not imposed any limitation upon its grant of the land in question, which was an island in the Mississippi river, separated from the adjoining land by a slough, the title of the riparian owners extended to the thread of the river, and included the island.''

In the case of *Schurmeir v. St. Paul & Pac. R. R. Co.,* 10 Minn. (82) 59, 88 Am. Dec. 59, the supreme court of that state in discussing this question says: ''We think, therefore, that it is too clear to admit of a reasonable doubt that the river bounds this lot on one side. But this being admitted, the further question is presented, whether the riparian owner takes to high-water or low-water mark, or to the middle thread of the stream. At common law, grants of land bounded on rivers above the tide water carry the exclusive right and title of the grantee to the middle thread of the stream, unless an intention on the part of the grantor to stop at the edge or margin is in some manner clearly indicated; except that rivers navigable in fact are public highways, and the riparian proprietor holds subject to the public easement. In this case no intention is in any way indicated to limit the grant to the water's edge, and if the common-law rule prevails here, Roberts, by his purchase, took to the center of the river, including the land subsequently surveyed by the government—called Island No. 11—and which is now claimed by the defendants. The common law of England, so far as it is applicable

to our situation and governments, is the law of this country in all cases in which it has not been altered or rejected by statute, or varied by local usage under the sanction of judicial decisions. (2 Kent Com., 27, 28.) We think, in respect to the rights of riparian owners, it is as applicable to the circumstances of the people in this country as in England. . . . . We think no reason can be given why the same rule should not apply to grants made by the government that are applicable to grants made by individuals.''

This case was affirmed by the supreme court of the United States, 74 U. S. 272, 19 L. ed. 74.

A very concise and forcible statement of this question is to be found in *Gavit v. Chambers,* 3 Ohio, 496, in which the court says: ''It is, we conceive, vitally essential to the public peace and to individual security, that there should be distinct and acknowledged legal owners for both the land and water of the country. This seems to have been the principle upon which the common-law doctrine was originally settled, that where a stream was not subject to the ebb and flow of the tide it should be deemed the property of the owners of the soil bounding upon its banks.''

If the opposite rule be adopted, the court further observes:

''At what point does the right of the owner of the adjoining lands terminate? On the top, or at the bottom of the bank? At high or at low water mark? Does his boundary recede and advance with the water, or is it stationary at some point? And where is that point? Who gains by alluvion, who loses by the direptions of the streams? No satisfactory rules can be laid down, in answer to these questions, if the common-law doctrine be departed from. . . . . It cannot be reasonably doubted, that, if all the beds of our rivers supposed to be navigable, and treated as such by the United States, in selling the lands, are to be regarded as unappropriated territory, a door is opened for incalculable mischiefs. Intruders upon the common waste would fall into endless broils among themselves, and involve the owners of the adjacent lands in controversies innumerable. Stones, soil, gravel, the right to fish, would all be subjects for individual scramble, necessarily leading to

violence and outrage. The United States would be little interested in preserving either the peace or the property, and, indeed, would be powerless to do it, without an interference with the policy of the state, as unsuitable for the Union to exercise, as it would be inconvenient, if not dangerous, to state sovereignty. We do not believe that it was the intention of the United States to reserve an interest in the bed, banks, or water of the rivers in the state, other than the use for navigation to the public, which is distinctly in the nature of an easement, and all grants of land upon such waters we hold to have been made subject to the rule of the common law, which, in this case, is the plain rule of common sense. And it is this: He who owns the lands upon both banks, owns the entire river, subject only to the easement of navigation, and he who owns the land upon one bank only, owns to the middle of the river, subject to the same easement. This is the rule, recognized not only in England, but in our sister states.''

In the case of *Ingraham v. Wilkinson*, 4 Pick. 268, 16 Am. Dec. 342, the supreme court of Massachusetts says:

''The question then arises, to whom belongs an island formed by a division of the waters of a river, where, but for the island, the borderers on the river would meet each other in the middle of the river; and this question must be settled by analogy to cases of a similar nature, which, though they may have arisen in other countries under the jurisdiction of the civil law, have nevertheless been adopted by the common law as fairly coming within its general principles.''

The court, after quoting at length from the Code of Napoleon and other writers, says:

''Although these wise provisions seem to be confined to the case of islands recently formed, the same reason will extend them to the case of islands, the origin of which cannot be traced, unless the property in them has been otherwise appropriated according to the rules of law; for whether originally formed by deposits from the water, or by a sudden division of the river, would seem to be immaterial, unless the owner of one side should be able to show that it was created by a disruption from his land. According to these principles,

therefore, this island belongs in severalty to these borderers on each side of the stream, if their lands on the main are co-extensive with the island; if not, then the owners of the next adjoining lots will have a right to claim a portion of the island conformable to their lines."

This case was approved in *Pratt v. Lamson,* 2 Allen, 284; *Hopkins Academy v. Dickenson,* 9 Cush. 548; *Commonwealth v. Alger,* 7 Cush. 97. In 9 Cush. 548, a construction is placed on the case of *Ingraham v. Wilkinson,* and the court says:

"It recognizes the rule of common law, that the property in the soil of rivers not navigable, subject to public easements, belongs to those whose lands border upon them; and from this right of property in the soil in the bed of the river the court deduce the right of property in an island which gradually arises above the surface and becomes valuable for use as land. Assuming the thread of the river as it was immediately before such island made its appearance, this rule assigns the whole island, or bare ground formed in the bed of the river, if it be wholly on one side of the thread of the river, to the owner on that side; but if it be so situated that it is partly on one side and partly on the other of the thread of the river, it shall be divided by such line and held in severalty by the adjacent proprietors."

Mr. Farnham, in discussing this question in vol. 1, at p. 244, says:

"There is, undoubtedly, a perceptible advantage in owning land adjoining a navigable body of water. So plainly is this true that in all new countries settlers locate upon such waters before they go further inland, and the course of commercial activities follows very closely the lines of navigable waters. To deprive such a settler of his advantage is to take from him a portion of the value of his property. In addition to this there is a value in the use of the bed and shores of the water which can be availed of in subordination to the public right of navigation, and which is very material. A forceful illustration of this is the fact that in almost every instance when a state has established its title as against the riparian owner, it has immediately proceeded to grant the beds and shores,

or a portion thereof, thereby making a revenue for its own use. . . . . When, in addition to this, it is remembered that the title, if held to be in the riparian owner, is subject to practically the same trusts to which it would be subject if it was in the public, there is no excuse for the efforts which have been made to deprive the riparian owner of his advantage. The rule of the common law is definite and certain. It has solved all the problems for hundreds of years where it has been adopted; while the opposite rule is indefinite, uncertain and a source of prolific litigation. By the common-law rule the title above tide water is in the riparian owner, subject to the public use. Under that rule there is no temptation on the part of the state to interfere with the riparian rights of the abutting owner.''

In *Hardin v. Jordan,* 140 U. S., at page 388, 11 Sup. Ct. 814, 35 L. ed. 428, the court says:

''Of course, as already stated, there is no question where the land abuts and bounds upon a fresh-water stream or river. In such cases the law is perfectly plain. Sir Matthew Hale says: 'Fresh rivers, of what kind soever, do of common right belong to the owners of the soil adjacent, so that the owners of the one side have, of common right, the proprietary of the soil, and consequently of the right of fishing, *usque ad filum aquae;* and the owners of the other side, the right of soil or ownership and fishing unto the *filum aquae* on their side. And, if a man be owner of the land of both sides, in common presumption, he is owner of the whole river, and hath the right of fishing according to the extent of his land in length.' (De Jure Maris, Pt. I, chap. I.)''

But it is useless to pursue this inquiry further. The authorities are in conflict, and the better reason we think is with the contention that the riparian owner takes title to the thread of the stream, both in navigable and non-navigable rivers, subject to an easement for the use of the public.

The supreme court of Michigan in the case of *Goff v. Cougle,* 118 Mich. 307, 76 N. W. 489, 42 L. R. A. 161, says:

"The court left the question to the jury to determine whether or not there was an island in the river, and the jury must have found that there was; so that question must be taken as settled, that there was an island in fact. But, so far as the record shows, there was no island there which had been recognized by the government as such, and which was no part of the main land. The deeds to defendant conveyed to him the lands in controversy, unless the south channel is treated as the Clinton river within the meaning of the deeds. The deeds cannot be so construed, as even upon meandered streams the lands extend to the middle thread; and it appears that the north channel is the main channel, so that defendant's deeds conveyed land extending to the middle of the main channel."

To this case is attached a very exhaustive note treating this entire subject, and classifying the cases as to their respective holdings upon this question. The annotator says:

"The common-law rule that the title to nontidal rivers is in the riparian owner has the presumption that it is the rule of common sense behind it, because it has survived the test of time. Moreover, it has the advantage of certainty. No other rule will determine with certainty where the title is. But when it is considered that the riparian owner has a right of access to waters, the title to the beds of which is in the state (*State ex rel. Denny v. Bridges*, 19 Wash. 44, 52 Pac. 326, 40 L. R. A. 593), and that the state has control of navigable waters although the title to the bed is in the riparian owner, it would seem that it made little difference which rule was followed."

To hold in this case that the plaintiff under his grant from the government took title only to high-water mark, and that between high and low water mark there is a body of unsurveyed land which was not included in his grant, because it was an island, or in excess of his grant, would the public suffer or be damaged any more than if such unsurveyed land should afterward be surveyed and some other person procure title to the same? Either the plaintiff's land or the land of such other person would extend to low-water mark

or the thread of the stream, and if we hold, as contended by respondents, that Snake river to high-water mark is a public highway, we are unable to discover any theory or reason upon which to found an opinion that the public would be served and protected any more than to hold that the island in controversy is a part of lots 6 and 7 as contended by appellant. If the riparian owner owns the land only to high-water mark, in many instances in this state large bodies of land will be found between high and low water mark, which will be subject to disposition by either the state or the national government, as it is the policy of the government to encourage individual ownership in its lands and not to reserve title in the state. If such land would be subject to location by another, such locator would take title either to low-water mark, or the thread of the stream, and if to the thread of the stream, the same objection could be urged against the owner as against the appellant in this case. But we are unable to discover upon what theory title passed from the national government to the state.

Our attention has not been called to any act of Congress which seems to indicate a grant from the national government to the state, and if title did not pass to the state, then it is apparent that the title to the land between high-water mark and the thread of the stream did pass to the riparian owner or was reserved in the national government. In this case the national government made no such reservation. The patent to the plaintiff's grantor passed all land bounded by Snake river on the south in lots 6 and 7, sec. 1.

Counsel for respondent also contends that under the provisions of the U. S. Rev. Stat., sec. 2476 (U. S. Comp. Stat. 1901, p. 1567), all navigable rivers are reserved as public highways, and because of such reservation, title could not pass to the riparian owner only to high-water mark, as the remainder of the bed of the stream is reserved as a public highway. This section reads as follows:

"All navigable rivers within the territory occupied by the public lands shall remain and be deemed public highway, and in all cases where the opposite banks of any streams not

navigable, belong to different persons, the stream and the bed thereof shall become common to both.''

It will be observed that this section reserves the waters of a stream as a public highway, but recognizes that the bed of the stream belongs to the riparian proprietors.

In *Schurmeier v. St. Paul & Pac. R. R. Co., supra,* the court says:

''This act of Congress provides that all navigable rivers within the territory to be disposed of by virtue of that act, shall be deemed 'to be and remain public highways.' At common law, rivers navigable in fact are public highways, and the riparian owner holds subject to the public easement. This act of Congress, therefore, is merely a declaration or affirmance of the common law, and not a modification of it. The fact that these rivers are, and must remain, public highways, is not at all inconsistent with the view that riparian owners have the fee of the bed of the stream.''

In discussing this question in *Braxon v. Bressler,* 64 Ill. 488, the court says:

''The meaning of the act of Congress declaring that all navigable streams within the territory to be disposed of should be deemed to be and remain public highways is that the river, navigable in fact, should be subject to the public easement; that the public should enjoy its free and uninterrupted navigation, unobstructed by dams, bridges or other structures which might materially impede its commerce; that it should be a common highway for every vessel which might float upon its waters. The intention of Congress was only to reserve the use of the river. This the public could possess without interference with the riparian owner, and the latter could have his right to the bed of the stream without interference with the *jus publicum.* The peace of society and the security of personal rights demand the legal recognition of ownership of the beds of the streams within the states, as well as the water. He should have the right to protect the bed of the stream from individual trespasses. The opposite view vests the fee in the United States, and makes it the proprietor of every navigable stream in the state. Its inter-

position in the prosecution of trespasses would be an inter-meddling with the policy of the state, and would be perilous to its sovereignty. The common-law rule would best subserve the public peace and protect from violence.''

Some conflict in the authorities arises out of the question as to what are navigable streams. Applying strictly the rule generally applied by courts as a test of navigability, perhaps all of the streams in this state would be non-navigable. But we do not deem it wise to apply the same test in determining the navigability of a stream. In the case of *Harrison v. Fite,* 148 Fed. 781, 78 C. C. A. 447, the court says:

''To meet the test of navigability as understood in the American law, a watercourse should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs. It should be of practical usefulness to the public as a public highway in its natural state and without the aid of artificial means. A theoretical or potential navigability, or one that is temporary, precarious and unprofitable, is not sufficient. While the navigable quality of a watercourse need not be continuous, yet it should continue long enough to be useful and valuable in transportation; and the fluctuations should come regularly with the seasons, so that the period of navigability may be depended upon. Mere depth of water, without profitable utility, will not render a watercourse navigable in the legal sense so as to subject it to public servitude, nor will the fact that it is sufficient for pleasure boating or to enable hunters or fishermen to float their skiffs or canoes. To be navigable, a watercourse must have a useful capacity as a public highway of transportation.''

If this test be applied to streams of this state, they would all no doubt fail to come up to the standard thus fixed, of navigability. But we do not believe that this test will fit the conditions prevailing in this state, or best serve the public in the use made of its streams. It is common knowledge that most of the streams of this state rise in the mountains, and are used more generally for floating timber than for

carrying passengers or freight. This being so, we deem it advisable to recognize as navigable, streams used either for transporting freight or passengers by boats, or for floating lumber, logs, wood or any other product to the market. The correct rule, we think, is stated in Black's Pomeroy on Water Rights, sec. 218, as follows:

"In those states where lumbering is a principal industrial interest, it has been found necessary to establish a new rule in respect to the use of the streams, which is not founded upon any principle or precedent of the common law, but solely upon the local exigencies and customs. This rule is, that a fresh-water stream which is capable of being used for the purpose of floating down logs to the mills or to market, although it may be too small to admit of navigation, is 'navigable' (or more properly 'floatable') and a public highway, in the sense that the general public have an easement of passage over it for that purpose, though the title to the bed of the stream may remain in the riparian owners, subject to such public easement."

We believe, therefore, the conditions prevailing in this state fully justify this court in holding many streams to be navigable which, under the decisions of other states would be non-navigable, and that this court is fully warranted in applying the principle of riparian ownership, as applied in many states to non-navigable rivers, to what we term navigable rivers. The fact that navigable rivers are reserved as public highways, in no way interferes with the legal doctrine that the riparian owner takes to the thread of the stream. Snake river being a navigable river is a public highway, and subject to the use of the public, not only to low-water mark, but to high-water mark, and the riparian owner can in no way interfere with this use. In the case of *Powell v. Springston Lumber Co.*, 12 Ida. 723, 88 Pac. 97, this court, through Justice Ailshie, says:

"Navigable streams are public highways over which every citizen has a natural right to carry commerce, whether it be by boats or the simple floating of logs. The appellant has an undoubted right to float his logs and timber down the Coeur

d'Alene river, but in doing so, he must have due consideration and reasonable care for the equal right of defendant.'' Again, ''the right of a riparian owner to use a stream implies the necessity as well as right to pass from the shore to the navigable waters of the stream, and this in turn must require some effective means or medium by which to reach such point for loading or unloading the commercial and floatable commodity.'' (*People v. Gutchess,* 48 Barb. 656.)

Most of the streams in this state have their origin in the mountains, and are fed from springs and the melting snows, and it is common knowledge to all that the rise and fall of such streams is often very sudden and decided; that within a few hours or days, at most, many of the streams which in ordinary times are but a few feet in width, in times of high water are many hundred feet wide; that during high-water many acres are covered by the waters of said streams, which, during the greater portion of the year are rich agricultural lands and very productive; that to reserve to the state or national government the lands covered during high-water seasons, and limit the riparian owner to the high-water bank, would in many instances take away from the riparian owner the most valuable portions of his landed interest, and deny him the right of access to the water of such streams. To thus limit the boundary lines of the riparian owner would take away without compensation large bodies of land upon which valuable improvements have been made, and upon which many people depend for a livelihood, and which is the source of much of the wealth of this state. It would fix as the boundary line of the riparian proprietor, a line of uncertainty which might shift and change as the high and low water seasons change, and which would result in endless litigation and uncertainty. As stated by the court in *Lamprey v. State,* 52 Minn. 181, 38 Am. St. Rep. 541, 53 N. W. 1139, 18 L. R. A. 670.

''The incalculable mischiefs that would follow if the riparian owner was liable to be cut off from access to the water, and another owner sandwiched in between him and it, whenever the water line had been changed by accretions and relic-

tions, are self-evident, and have been frequently animadverted on by the courts. These considerations certainly apply to riparian ownership on lakes as well as on streams. . . . . The owners of lands bordering on them have often bought with reference to access to the water, which usually constitutes an important element in the value and desirability of the land. If the rule contended for by the appellants is to prevail, it would simply open the door for prowling speculators to step in and acquire title from the state to any relictions produced in the course of time by the recession of the water, and thus deprive the owner of the original shore estate of all riparian rights, including that of access to the water. The endless litigation over the location of the original water lines, and the grievous practical injustice to the owner of the original riparian estate, that would follow, would, of themselves, be a sufficient reason for refusing to adopt any such doctrine. That the state would never derive any considerable pecuniary benefit—certainly none that would at all compensate for the attendant evils—we may, in the light of experience, safely assume. Our conclusion, therefore, is that upon both principle and authority, as well as considerations of public policy, the common law is that the same rules as to riparian rights which apply to streams apply also to lakes and other bodies of still water.''

These reasons so forcibly stated by the author, in our judgment, are unanswerable when applied to the streams of this state, and to adopt a different doctrine would, in our judgment, lead to incalculable injury, not only to the property owner, but to the public at large. Counsel for respondent, however, contends that it would be an injustice in this case to hold that the island in controversy was a part of lots 6 and 7, because by so doing there would pass to appellant under his patent 92 acres of land, when as shown upon the government plat, there was only 44.40 acres in said lots 6 and 7. But·under said patent, the patentee took to the stream, and the fact that upon the plat there is shown to be 26.55 acres in lot 6, and 17.85 acres in lot 7, established only one thing and nothing more, and that is that in issuing said patent, the

government required the patentee to pay only for the land as marked on said plat. But it is no evidence that more land would not pass by said grant. Justice Ailshie, speaking for the court on a similar subject, in *Johnson v. Hurst*, 10 Ida. 308, 77 Pac. 784, in effect holds that so far as the government is concerned, and the general land office which represents that branch of the government, all of the lands lying within sec. 1, including lots 6 and 7, have been surveyed and returned to the land office, and the lands therein contained have been thrown on the market for settlement and sale. No other survey has ever been made by or on account of the government, and the government has at no time complained of the appellant having or occupying more land than belongs to him, nor has it ever asserted any right to any part thereof. And the court says:

"We know of no principle of law whereby any third party can now be heard to complain. If the government has parted with a larger acreage than it received pay for, that fact cannot concern the defendant or any other third person who does not claim title from the government. Indeed, there is doubt if the government itself under the facts in this case, could now be heard to question the plaintiff's title, but with that issue we have nothing to do in this case."

In the case of *Mitchell v. Smale*, 140 U. S. 406, 11 Sup. Ct. 819, 35 L. ed. 442, the supreme court of the United States sustained the title of a riparian owner to 25 acres between the meander line and the water line, when the patent called for only a fractional one-quarter section containing 4.53 acres. In the case of *Sherwin v. Butzer*, 97 Minn. 252, 106 N. W. 1046, the supreme court of that state sustained the title of a riparian owner to 143.93 acres between the meander line and the lake in a different section, where his patent called for 68.6 acres. In opposition to this view, however, the respondent calls our attention to the leading case of *Horne v. Smith*, 159 U. S. 40, 15 Sup. Ct. 988, 40 L. ed. 68, in which the supreme court of the United States held: "Where the meander line of a government survey was really a mile or more from the main waters of a river and the water line of

a bayou opening into the river was intended as a real boundary, the patent describing the land by the number of the sections and its quantity as 170 acres, will not convey a strip of unsurveyed land of a mile or more in width containing 700 acres between the bayou and the river, although the official plat names a river as the boundary of the survey.'' This decision, however, is based upon the fact that the land was in different sections from the land described in the patent, and the fact that a large body of land was omitted from the survey satisfied the court that a mistake had been made. The facts in that case, however, are not applicable to the case under consideration, as here the government is not complaining, and it does not appear that any mistake was made or that any fraud would be perpetrated upon the government if the survey as shown by the official plat be sustained. In the case at bar the land in controversy is in the same section as the land patented to the grantor of appellant, and partly in the same legal subdivision as lot 7, the remainder being in the forty acre tract south of lot 6. So applying the rule adhered to in *Horne v. Smith, supra,* and many cases cited by respondents, it does not apply in this case. Here the land in controversy is in the same section as the land patented; the thread of the stream is in the same section; the acreage patented and the land claimed are not so disproportionate in size as to indicate that the island was not intended to be covered by the survey.

In the answer in this case, the defendants set up title by adverse possession, but the court made no finding upon that issue. The transcript discloses that after the respondents had offered certain evidence with reference to the defendants' possession of said property, the plaintiff offered evidence in relation thereto, which was disallowed by the court. Had the court made a finding in favor of the defendants on this issue, the refusal to allow plaintiff to introduce evidence on that issue would have been error. But inasmuch as the court made no finding on this question, the plaintiff was not harmed thereby.

We are therefore of the opinion that the court erred in holding that lots 6 and 7 claimed by the plaintiff extended only to the north water line of Snake river, which is at the base or foot of said bluff or rim-rock, and that the defendant, Walter Gridley, is the owner of the unsurveyed tract of land known as Weatherby Island in sec. 1, township 8 south, of range 13 east; and in holding that said island nor any part thereof is not included in said lots owned by the plaintiff, and erred in entering judgment for the respondents. The judgment, therefore, will be reversed and a new trial ordered as to the defense of the statute of limitations and adverse possession. Costs awarded to appellant.

Ailshie, C. J., concurs.

Sullivan, J., dissents.

SULLIVAN, J., Dissenting.—I am unable to concur with the majority of the court in the main principle of law involved in this case, and would merely dissent without expressing my views if I did not consider that the rule of law applied to navigable streams of this state was so at variance with the rule as laid down by the supreme court of the United States and the supreme courts of the Pacific Coast states and many other of the leading states of this country. As I view it, the rule laid down is so at variance with the best interests and rights of the people of the state and contrary to the decisions of so many of the courts of last resort of many of the states, that I cannot permit the decision to go unchallenged and without entering my earnest protest against the doctrine therein laid down, which I think is contrary to sound principles of public policy.

The supreme court of the United States is the court of last resort for the interpretation of all laws of Congress, and that court has interpreted many of the land laws of Congress, and has declared and passed upon the extent of the title conveyed by patents from the United States to riparian owners to lands bordering on navigable streams within the states and territories, and it would seem to me that the decisions of that

court upon the question of the extent of such grants should be accepted by this court, rather than the views of some of our state courts and the opinion of a text-book writer whose practice and environment may have led him to express views to the effect that the common-law rule as to navigable rivers is better adapted to the wants of the people of this great nation, and ought to be applied to our great navigable streams and lakes, instead of the rule laid down by the supreme court of the United States. I am inclined to give greater weight to the decisions of the supreme court of the United States, especially when construing the extent of the grants of the United States to purchasers of the public lands, than my associates give to them.

One of the state court decisions recognized to be the ablest on the question of the extent of the title acquired under a United States patent by a settler on riparian lands is that of *McManus v. Carmichael,* 3 Iowa, 1. That decision was rendered in 1856, and time has proven the wisdom of the rule there laid down, to wit: That the riparian owner, under a grant from the government, takes to high-water mark only. Gould in his work on Waters, 3d ed., sec. 72, refers to that case as one of the leading American authorities upon this subject, and referring to other decisions, that authority in sec. 67 of said work states that the doctrine that some of the states have held with regard to the private ownership of the beds of navigable waters above the tide, is at variance with sound principles of public policy, and the supreme court of the United States cites the case of *McManus v. Carmichael, supra,* as holding to the correct rule and as being consistent with the sound principles of public policy.

In *Barney v. Keokuk,* 92 U. S. 324, 24 L. ed. 224, this question was given profound consideration by that great court. The common-law doctrine of navigable rivers and tide waters was reviewed. The condition existing between the extent and topography of the small British Island and that of the great American continent is there commented on. The influence of the common-law doctrine for two generations is declared to have excluded the admiralty jurisdiction from our great rivers

and inland seas, and it is stated how, under the influence of that doctrine, a number of the states of the Union adopted it without regard to the ownership of the soil under navigable waters above tide water, and then the court declared that such doctrine is at variance with ''sound principles of public policy''; and further declared that there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. But in the face of that decision, the majority of this court have saddled on to this young commonwealth the antiquated, by-gone, obsolete, effete and discarded doctrine of the common law in that regard, which is not applicable to the conditions of this country, and has been rejected by many of the states of the Union and most, if not all, of the Pacific Coast states, including California, as well as by the supreme court of the United States.

In the case of *Barney v. Keokuk, supra,* the supreme court of the United States declared that the beds and shores of navigable streams properly belong to the respective states by their inherent sovereignty, and also declared that the United States has wisely abstained from extending its surveys and grants beyond the limits of high-water mark; while my associates hold that such grants do extend to the thread of the stream, regardless of this decision of the supreme court of the United States. It seems that my associates prefer to take the views of a text-book writer and the decisions of some of the states that have been hampered by the common-law rule which was intended to apply to a country whose longest river is but 300 miles in length, when our own Snake river is more than 1,000 miles long, to the opinion of the supreme court of the United States as to the extent of the government grant to settlers on navigable streams. The supreme court in that case further declares that all cases in which that court has seemed to hold to a contrary view or doctrine depended on the local laws of the state where such lands were situated, and my associates have quoted and rely upon those cases from the supreme court of the United States which were decided and depended upon the local laws of the state from whence such cases were taken, and not upon the sound principles of pub-

lic policy, which principles are referred to in the case of *Barney v. Keokuk.* In that decision, speaking through Mr. Justice Bradley, the court said:

"The confusion of navigable with tide water, found in the monuments of the common law, long prevailed in this country, notwithstanding the broad differences existing between the extent and topography of the British Island and that of the American continent. It had the influence for two generations of excluding the admiralty jurisdiction from our great rivers and inland seas; and under the like influence, it laid the foundation in many states of doctrines, with regard to the ownership of the soil in navigable waters above tide water, at variance with sound principles of public policy. Whether, as rules of property, it would now be safe to change these doctrines, where they have been applied, is for the several states themselves to determine. If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections. In our view of the subject, the correct principles were laid down in *Martin v. Waddell,* 16 Pet. 367, 10 L. ed. 997, *Pollard v. Hagan,* 3 How. (U. S.) 212, 11 L. ed. 565, and *Goodtitle v. Kibbe,* 9 How. (U. S.) 471, 13 L. ed. 220. These cases related to tide water, it is true; but they enunciate principles which are equally applicable to all navigable waters. And since this court, in the case of *The Genesee Chief,* 12 How. (U. S.) 443, 13 L. ed. 1058, has declared that the Great Lakes and other navigable waters of the country, above, as well as below, the flow of the tide, are, in the strictest sense, entitled to the denomination of navigable waters, and amenable to the admiralty jurisdiction, there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. It properly belongs to the states by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its surveys and grants beyond the limits of high water. The cases in which this court has seemed to hold a contrary view depended, as most cases must depend, on the local laws of the states in which the lands were situated."

In *Shively v. Bowlby,* 152 U. S. 1, 14 Sup. Ct. 548, 38 L. ed. 331, which is a very exhaustive opinion, and refers to and discusses numerous cases in regard to tide waters and navigable rivers, in referring to the extent of grants by Congress of portions of public lands within a state or territory, the court said:

"Grants by Congress of portions of the public lands within a territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high-water mark, and do not impair the title and dominion of the future state when created; but leave the question of the use of the shores by the owners of uplands to the sovereign control of each state, subject only to the rights vested by the constitution in the United States."

It is there held that the grants by Congress of portions of the public lands within a state or territory to settlers thereon, though bordering on or bounded by navigable waters, whether tide water or not, convey of their own force no title or right below high-water mark, and do not impair the title and dominion of the state to the lands below high-water mark. In the face of that decision, my associates hold that such grants go to the center of the navigable stream, including all islands therein.

In the very celebrated case of the *Illinois Central Ry. Co. v. People of the State of Illinois,* 146 U. S. 387, 13 Sup. Ct. 110, 36 L. ed. 1018, regardless of the decisions of the supreme court of the state of Illinois in regard to navigable waters, the United States supreme court held that the bed or soil of navigable waters was held by the people of the state in their character as sovereigns in trust for public uses for which they are adapted. By an act of the legislature, it had been undertaken to deprive the state of the fee and control over the bed and waters of the harbor of Chicago, and place the same in the hands of a private corporation, and the court there held that there could be no irrepealable contract in a conveyance of property by a grantor in disregard of a public trust under which he was bound to hold and manage it. The legislature of Illinois by that act endeavored to grant the fee to the

Illinois Central R. R. Co., its successors and assigns, to the bed of said harbor. Referring to tide waters and the rule of the common law with reference thereto, the court said:

"The same doctrine is in this country held to be applicable to lands covered by fresh water in the Great Lakes over which is conducted an extended commerce with different states and foreign nations. . . . . At one time the existence of tide waters was deemed essential in determining the admiralty jurisdiction of courts in England. That doctrine is now repudiated in this country as wholly inapplicable to our condition. . . . . When the reason of the limitation of admiralty jurisdiction in England was found inapplicable to the condition of navigable waters in this country, the limitation and all its incidents were discarded. . . . . The public being interested in the use of such waters, the possession by private individuals of lands under them could not be permitted except by license of the crown, which could alone exercise such dominion over the waters as would insure freedom in their use so far as consistent with the public interest. The doctrine is founded upon the necessity of preserving to the public the use of navigable waters from private interruption and encroachment, a reason as applicable to navigable fresh waters as to waters moved by the tide."

And it is there held that the bed or soil of navigable waters in this country is held by the people of the state in their character as sovereign, in trust for public uses for which they are adapted. In that case the legislature of the state had undertaken to deprive the state of its control over the bed of the harbor of Chicago by granting it in fee to the Illinois Central Railroad Company.

My associates appear to be trying to imitate the legislature of Illinois by attempting to convey in fee by judicial construction to the riparian land owners the title to the beds of our navigable streams, without any authority of law or permission granted by the sovereign people, and as I view it, contrary to the decision of the supreme court of the United States as to the extent of a government grant. We, no doubt, will have the same results under this decision that they have had in

Illinois and other states where the contrary doctrine is held, of the riparian land owner collecting toll from those using the stream for transportation, for tying up their vessels to the shore, or for other purposes of navigation.

Not only that, but there are many islands in Snake river containing from a few acres of land up to more than a hundred, that my associates have magnanimously bestowed upon the adjacent riparian land owner as a gift, and, as I think, contrary to the rights and interests of the people generally.

In the opinion of my associates, it is stated that in the United States where the test of navigability is navigability in fact, the decisions in reference to the boundaries of land lying upon nontidal, navigable rivers are absolutely in conflict. We concede that they are in conflict, but contend that my associates have taken the view contrary to the decisions of the United States supreme court, and as that court held in *Barney v. Keokuk, supra,* to be "at variance with sound principles of public policy," as well as contrary to the decisions of many of the state courts. Mr. Justice Stewart suggests, after concluding that the authorities are in hopeless conflict, that the text-book writers are unable to determine accurately what the several courts have held. I would suggest that the decisions of the supreme court of the United States upon this question are not in hopeless conflict. They do not give forth contradictory rules or doctrines, but hold to the one rule that sound principles of public policy require the title to the land under navigable waters to remain in the state. It is not the function of this court to grant and give away lands belonging to the state by adopting a doctrine which the supreme court of the United States has declared to be at variance with sound principles of public policy, against which doctrine we have such a long list of decisions of courts of last resort of the states of the Union. Under such circumstances, this court should preserve the rights of the state and the people, and the state under proper regulations should protect the rights of the riparian land owner and the rights of all the people to the reasonable use of such streams and their beds and convey them to no private owner.

In the case of *Hardin v. Jordan,* 140 U. S. 371, 11 Sup. Ct. 808, 35 L. ed. 428, the court held that the grants of the government for lands bounded by streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the state in which the land lies, and in a number of decisions the supreme court follows the decisions of the state courts so far as the title to the beds of navigable rivers is concerned. While that court states that it is contrary to or at variance with the "sound principles of public policy" to permit private ownership of the beds of navigable rivers, it sustains the decisions of the supreme courts of several states which are thus designated as "at variance with the sound principles of public policy," on the ground that after a territory becomes a state, the title to the beds of navigable streams is transferred to the state, and if the state desires to give it away and donate it without compensation to riparian owners, the supreme court of the United States will not interfere, unless it should be necessary to do so in order properly to regulate commerce, as it did do in *Illinois Central Ry. Co. v. Illinois, supra.* It is there declared that the right of the states to regulate and control the shores of navigable waters and the land under them is supreme, and it is there further held that it depends upon the law of each state as to what waters and to what extent this prerogative of the states over the beds of such streams shall be exercised. It is upon that theory that many of the decisions of the state courts have been sustained by the supreme court of the United States. It is held that after statehood, the state holds the title to the beds of navigable streams, and that the state may dispose of them, if it desires to do so, to private owners. The decisions are to the effect that no such disposition shall interfere with the rights of the general government to regulate commerce on such navigable streams.

It is suggested by my associates that it is vitally essential to the public peace and to individual security that boundaries of land should be definitely fixed and that they are definitely fixed by taking the thread of the stream. This is not, and

cannot be, true in this state where many of our large streams from year to year change their thread. Only recently one of the large rivers of the state changed its thread more than a mile from where it was one year ago. The average high-water mark would be just as safe and certain a boundary as the thread of the stream. If one varies, as a rule the other also varies.

It is stated in sec. 76 of Gould on Waters, 3d ed., that "The true boundary line of a navigable stream or lake is the point to which the water usually rises in ordinary seasons of high water," and I think that line just as definite and as certain of ascertainment as the thread of the stream.

It is perhaps useless for me to continue this subject further, but the decision of my associates, as I view it, is so at variance with the principles of sound public policy and the rights of the people, that I could not refrain from expressing my opinion upon the main principle of law involved in this case.

It has been suggested that there is no law of the United States transferring the beds of the navigable streams of Idaho to the state. We concede that there is no positive law of Congress to that effect, but under the construction given by the supreme court of the United States to the land laws of Congress, and to the grants of the government, as soon as a territory becomes a state, the title to the beds of all navigable streams goes to the state. I would suggest that there is no law of this state authorizing this court to transfer lands belonging to the state to private ownership, as has been done in this case. The supreme court of the United States has the authority to construe the extent of grants from the United States government. This court takes the title to the beds of navigable rivers from the people and gives it to private land owners without any authority in law and without any jurisdiction in the court to do so. While generosity is recognized as a good quality of heart, it is not a very just rule for the courts to be more generous with the state's property than it would be with its own property.

A long line of able decisions, standing at the head of which are those of the United States supreme court, holds that grants

of the government to settlers along navigable streams only extend to high-water mark, and why this young state should adopt the common-law rule in regard thereto is beyond my comprehension, for by so doing hundreds of acres of lands belonging to the public of the state are turned over to a few riparian private land owners, and as there are many islands in Snake river containing from a few acres up to more than a hundred, they are by this decision given to persons who did not purchase them and did not intend to do so. To such prodigality with the people's inheritance, I am unalterably opposed. Why not protect the people's rights by following the precedents of the strongest courts in the nation, rather than follow the decisions of courts which were hampered by and could not escape from the old common law and rule that is not at all adapted to the great rivers and lakes of the United States, one of which lakes would contain the British Island and the surface not then be half covered? There is a well-recognized line of decisions which hold that the riparian owners take to the low-water mark, and, as I view it, that rule would protect the interest of the people of the state much better than the one adopted by the majority of the court. In *Johnson v. Hurst,* 10 Ida. 308, 77 Pac. 784, this court held that the riparian owner took to the water line, not intimating that he took to the thread of the stream. However, in that case, the question of the ownership of the land between high and low water mark was involved, the parties apparently conceding that the riparian owners' rights did not go to the thread of the stream.

For the reasons above set forth, I think that the beds of our navigable streams should forever remain in the state for the benefit and welfare of the whole people, under proper state regulation, and not gratuitously given to riparian owners by the courts of the state or by the legislature.

Petition for rehearing denied.